RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 24a0227p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────

UNITED STATES OF AMERICA,

  *Plaintiff-Appellee,*

*v.*

JAYLAN MILES RA SHAWN GORE,

  *Defendant-Appellant.*

No. 23-3640

─────────────

Appeal from the United States District Court for the Southern District of Ohio at Columbus.
No. 2:23-cr-00004-1—Sarah Daggett Morrison, District Judge.

Argued: June 13, 2024

Decided and Filed: October 8, 2024

Before: GILMAN, STRANCH, and LARSEN, Circuit Judges.

─────────────

## COUNSEL

**ARGUED:** Keith A. Yeazel, Columbus, Ohio, for Appellant. Charles L. McCloud, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee. **ON BRIEF:** Keith A. Yeazel, Columbus, Ohio, for Appellant. Mary Beth Young, UNITED STATES ATTORNEY'S OFFICE, Columbus, Ohio, for Appellee.

─────────────

## OPINION

─────────────

LARSEN, Circuit Judge. Jaylan Gore was charged with possessing a stolen firearm, in violation of 18 U.S.C. § 922(j), and with receiving a firearm while under felony indictment, in violation of 18 U.S.C. § 922(n). Gore moved to dismiss the indictment on the ground that § 922(j) and (n) violate the Second Amendment. The district court denied the motion, and

Gore's case went to trial.  During voir dire, Gore raised a *Batson* challenge to the prosecutor's peremptory strike of the last black juror on the panel.  The district court rejected that challenge after finding that the prosecutor's motivations were race neutral.  The jury convicted on both counts, and the district court sentenced Gore to 18 months' imprisonment.  For the reasons that follow, we AFFIRM.

I.

On August 14, 2022, several burglars stole fifteen firearms from an outdoors store in Obetz, Ohio.  A few days later, law enforcement received a complaint about a group of young men with guns gathered around a vehicle in a parking lot.  Officers were dispatched to the scene, and as they approached the vehicle, some of the men—including Jaylan Gore—fled to a nearby apartment building.  Mikael Waters, who owned the vehicle, was in the driver's seat when the officers arrived.  The officers arrested Waters, and a search of the vehicle revealed one of the stolen guns.  During a monitored phone conversation in jail, Waters revealed that Gore had left the gun in his car.  Gore was under felony indictment for two Ohio firearms offenses at the time.  Officers later interviewed Gore regarding the burglary.  When police asked Gore whether they would find his DNA on the gun found in Waters' car, Gore admitted that he had "touched" that gun.  He also admitted that he knew the gun was stolen.

A federal grand jury charged Gore with possessing a stolen firearm, in violation of 18 U.S.C. §§ 922(j) and 924(a)(2), and with receiving a firearm while under felony indictment, in violation of 18 U.S.C. §§ 922(n) and 924(a)(1)(D).  Gore moved to dismiss the indictment, claiming that § 922(j) and (n) violate the Second Amendment on their face.  The district court denied the motion.

Gore's case proceeded to trial.  During voir dire, the government exercised a peremptory strike of juror 164, a black man.  Gore's counsel challenged the strike, noting that juror 164 was "the only person of color left in this panel," and asked that the government be required to "explain [its] reasons."  R. 57, Trial Tr., PageID 425.  The prosecutor explained that juror 164 was only 20 years old and that, "all things being equal," he thought a juror with "a little bit more life experience" would be better able to evaluate some of the issues in the case.  *Id.* at 426.  After

posing several questions to the prosecutor, the district court determined that the prosecutor was not motivated by juror 164's race and, thus, that the peremptory strike was permissible.

After trial, the jury found Gore guilty on both counts. The district court sentenced Gore to 18 months' imprisonment on each count, to be served concurrently. Gore timely appealed.[1]

## II.

We consider Gore's Second Amendment challenges before turning to his objection to the strike of juror 164.

## A.

We review de novo Gore's constitutional challenges to 18 U.S.C. § 922(j) and (n). *United States v. Utesch*, 596 F.3d 302, 306 (6th Cir. 2010). Gore challenges these provisions only on their face. A facial challenge "is the 'most difficult challenge to mount successfully,' because it requires a defendant to 'establish that no set of circumstances exists under which the Act would be valid.'" *United States v. Rahimi*, 144 S. Ct. 1889, 1898 (2024) (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)). Thus, the government will prevail if it can show that the provisions are "constitutional in some of [their] applications." *Id.*

The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. The Amendment protects an "individual right to keep and bear arms" for self-defense. *District of Columbia v. Heller*, 554 U.S. 570, 595, 635 (2008). But this right "is not unlimited." *Id.* at 595, 626. The Second Amendment "codified a *pre-existing* right" whose meaning is confirmed through consideration of its "historical background." *Id.* at 592. "From Blackstone through the 19th-century cases, commentators and courts routinely explained that the right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Id.* at 626.

---

[1]While Gore's appeal was pending, but after we heard oral argument, the Supreme Court decided *United States v. Rahimi*, 144 S. Ct. 1889 (2024). We received supplemental briefing from the parties addressing *Rahimi*'s effect on this case.

In *New York State Rifle & Pistol Association v. Bruen*, 597 U.S. 1 (2022), the Supreme Court articulated a new framework for reviewing Second Amendment challenges to firearm regulations. At *Bruen*'s first step, we determine whether "the Second Amendment's plain text covers an individual's conduct." *Bruen*, 597 U.S. at 17. If it does, "the Constitution presumptively protects that conduct." *Id.* We then move to *Bruen*'s second step, at which the government bears the burden of justifying its regulation of that conduct. *See id.* To do so, "the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Id.* Our task is to "ascertain whether the new law is 'relevantly similar' to laws that our tradition is understood to permit, 'apply[ing] faithfully the balance struck by the founding generation to modern circumstances.'" *Rahimi*, 144 S. Ct. at 1898 (quoting *Bruen*, 597 U.S. at 29 & n.7) (alteration in original). That balance controls because the Second Amendment right was "enshrined with the scope [it] w[as] understood to have when the people adopted [it]." *Bruen*, 597 U.S. at 34 (quoting *District of Columbia v. Heller*, 554 U.S. 570, 634–35 (2008)).

Questions "central" to this analogical inquiry are "[w]hy and how the regulation burdens the right" to keep and bear arms. *Rahimi*, 144 S. Ct. at 1898. We are to determine whether the law "comport[s] with the principles underlying the Second Amendment"; we are not in search of "a 'dead ringer' or a 'historical twin.'" *Id.* (quoting *Bruen*, 597 U.S. at 30).

1.

We first consider 18 U.S.C. § 922(j), which makes it "unlawful for any person to receive, possess, conceal, store, barter, sell, or dispose of any stolen firearm or stolen ammunition . . . , knowing or having reasonable cause to believe that the firearm or ammunition was stolen."

The government contends that we may resolve Gore's § 922(j) claim at *Bruen*'s first step because the statute prohibits conduct that is not covered by "the Second Amendment's plain text." *Bruen*, 597 U.S. at 17. In the government's view, the "right to 'keep and bear arms' does not plausibly include a right to 'keep and bear' weapons that belong to someone else." Appellee Br. at 20. There is some appeal to this position, but we decline to resolve the question here. Whether or not the Second Amendment's plain text covers stolen firearms, § 922(j)'s prohibition

is constitutional because it is consistent with our nation's regulatory traditions and thus satisfies step two.

As the district court reasoned, there is ample historical support for prohibitions on "the purchase or receipt of stolen goods, chattel, and other effects," and "there is no indication that firearms were exempt from such laws." *United States v. Gore*, 2023 WL 2141032, at *4 (S.D. Ohio Feb. 21, 2023). We include just a few examples here. A 1714 New Hampshire statute prohibited buying or receiving, from a person "of whom there is just cause of suspicion, any money, goods, wares, merchandizes, or provisions" that "appear" to be "stolen." *Acts and Laws of His Majesty's Province of New-Hampshire: In New England* 39–40 (1771) (1714 law). A 1788 New York law, meanwhile, provided that, "if any person shall buy or receive any goods or chattel of any value whatsoever, that shall be feloniously taken or stolen from any other person, knowing the same to be stolen, he or she, shall be taken and deemed an accessary to such felony after the fact." 2 *Laws of the State of New York Passed at the Sessions of the Legislature Held in the Year 1785, 1786, 1787 and 1788, Inclusive* 668 (1886) (1788 law). And in 1831, Ohio made it a misdemeanor punishable by three to seven years of imprisonment to "receive or buy any goods or chattels, of the value of fifty dollars or upwards, that shall have been stolen or taken by robbers, knowing the same to be stolen or taken by robbery, with intent to defraud the owner." 3 *Statutes of Ohio and of the Northwestern Territory, Adopted or Enacted from 1788 to 1833 Inclusive* 1727 (Salmon P. Chase ed. 1835) (1831 law). Additional examples abound. *See Gore*, 2023 WL 2141032, at *4 n.1. History "confirm[s] what common sense suggests":  the government may regulate the possession, purchase, and sale of goods that are known or believed to be stolen. *See Rahimi*, 144 S. Ct. at 1901. We are aware of no evidence that firearms have ever been exempt from such regulations.

Gore brings only a facial challenge to § 922(j), so we need not ponder whether there might be "*some* room for as-applied challenges" to this law. *United States v. Gay*, 98 F.4th 843, 846 (7th Cir. 2024). In at least some of its applications, § 922(j) is consistent with this nation's tradition of regulating the purchase and receipt of goods known or believed to be stolen, so it is not facially unconstitutional. The district court properly denied Gore's motion to dismiss this count of the indictment.

2.

Section 922(n) makes it "unlawful for any person who is under indictment for a crime punishable by imprisonment for a term exceeding one year to ship or transport . . . any firearm or ammunition or receive any firearm or ammunition."[2]

a.

The parties first dispute whether § 922(n) prohibits conduct that is protected by the plain text of the Second Amendment. Receiving a firearm, of course, is protected because it is a logical antecedent to "keep[ing]" a firearm. U.S. Const. amend. II. The government contends, however, that the Amendment's plain text "does not protect individuals' right to receive firearms *while under indictment for a felony*." Appellee Br. at 14 (emphasis added). In its view, felony indictees are not among those whom the Second Amendment "presumptively protects," *Bruen*, 597 U.S. at 17, because they are not "law-abiding, responsible citizens," *Heller*, 554 U.S. at 635. We disagree. The only textual hook for that position would be to say that felony indictees are not part of "the people" identified in the Amendment. And in *Heller*, the Supreme Court made clear that "'the people' . . . refers to all members of the political community, not an unspecified subset." 554 U.S. at 580. Recently, this court held that the phrase "the people" draws no distinction between felons and non-felons. *United States v. Williams*,113 F.4th 637, 649 (6th Cir. 2024). *A fortiori*, it does not distinguish between those who have and have not been *indicted* on felony charges. Rather, persons under felony indictment remain part of the national community, capable of asserting rights, even though their status may justify "*limitations* on individual rights." *United States v. Perez-Garcia*, 96 F.4th 1166, 1180 (9th Cir. 2024); *cf. Kanter v. Barr*, 919 F.3d 437, 451–53 (7th Cir. 2019) (Barrett, J., dissenting), *abrogated by Bruen*, 597 U.S. 1; *Worth v. Jacobson*, 108 F.4th 677, 692 (8th Cir. 2024) ("At the step one 'plain text' analysis, a claim that a group is 'irresponsible' or 'dangerous' does not remove them from the definition of the people.").

---

[2]The statute applies to persons indicted, or charged by information, for any crime punishable by more than a year of imprisonment. *See* 18 U.S.C. §§ 922(n), 921(a)(14). For simplicity, we will describe it as applying to persons indicted for felony offenses. That comports with the federal definition of "felony," *see* 18 U.S.C. § 3156(a)(3), and with many state definitions, though state definitions of "felony" do vary.

b.

Because the plain text of the Second Amendment covers the conduct at issue, the government "bears the burden to 'justify its regulation'" by showing that it "fits within" our nation's "historical tradition of firearm regulation." *Rahimi*, 144 S. Ct. at 1897 (citation omitted). The government has met that burden by pointing to the founding-era practice of pretrial detention, which is "relevantly similar" to § 922(n). *Id.* at 1898 (citation omitted).

At the outset, we describe the "why" and "how" of § 922(n), because the Supreme Court has instructed us that the regulation's justification and its burden are "*central* considerations" when searching for historical analogues. *Bruen*, 597 U.S. at 29 (citation and internal quotation marks omitted). The statute prohibits receiving, transporting, or shipping a firearm, but only during the stressful and fraught period between indictment and resolution of a criminal case. There are some obvious justifications for regarding this as an exceptional time: if a person obtains a gun once indicted, it might give rise to an inference that he has nefarious intentions toward a witness or victim, or toward law enforcement or court personnel; and if a person ships or transports a gun under the same circumstances, it could suggest that he wants to dispose of evidence or get a weapon into the hands of another for illicit purposes. In other words, § 922(n) furthers public safety and protects the integrity of the criminal process in the time between charge and conviction or acquittal. As for the burden, § 922(n) works a temporary, and limited, deprivation of Second Amendment rights. By its terms, it applies only while an indictment is pending. And it does not prohibit *possessing* firearms. So an indicted person who already possesses a firearm may continue to do so—and, therefore, will not be prevented from enjoying the "*central component*" of the Second Amendment right, the right of armed self-defense. *Id.*

The "why" and "how" of § 922(n) are relevantly similar to our nation's tradition of pretrial detention. "The American colonists carried with them the basics of criminal bail procedure" from England. Kellen R. Funk & Sandra G. Mayson, *Bail at the Founding*, 137 Harv. L. Rev. 1816, 1829 (2024). The purposes of that system were both to ensure the defendant's appearance at trial and to keep the public safe in the meantime. *See id.* at 1853; Anthony Highmore, Jr., *A Digest of the Doctrine of Bail in Civil and Criminal Cases* vii (1783) (in criminal cases, bail could be denied in order to secure "the safety of the people . . . against the

lawless depredations of atrocious offenders"); *see also Perez-Garcia*, 96 F.4th at 1182; *cf. Salerno*, 481 U.S. at 749, 752–55. The inherited English rule divided offenses into three categories: nonbailable offenses, offenses for which a judicial officer had discretion to bail, and offenses for which a defendant offering sufficient sureties was entitled to bail. *See* 1 Joseph Chitty, *Practical Treatise on the Criminal Law* *95–97; 4 William Blackstone, *Commentaries* *295–96. Serious crimes—like treason, murder, burglary, arson, and horse-stealing—put a defendant in the nonbailable category. 1 Chitty *95–96; *see* Funk & Mayson, 137 Harv. L. Rev. at 1832. So those defendants were detained before trial. *See, e.g.*, 4 Blackstone *294 ("[I]n felonies, and other offences of a capital nature, no bail can be a security equivalent to the actual custody of the person.").

In the 17th century, colonial authorities in Massachusetts and Pennsylvania reformed their approach to bail. *See* Funk & Mayson, 137 Harv. L. Rev. at 1835–42. Under this reformed approach, pretrial defendants had a right to bail "by sufficient sureties, except in capital cases where the proof is evident or the presumption great." *Id.* at 1842. Eventually, the reformed approach would emerge as the "consensus" rule across the young nation. Matthew J. Hegreness, *America's Fundamental and Vanishing Right to Bail*, 55 Ariz. L. Rev. 909, 925 (2013). But at the time the Bill of Rights was ratified, about half of the States still followed the English model, *see* Funk & Mayson, 137 Harv. L. Rev. at 1842–43, while the federal government and the remaining States opted for the reformed path, *see*, *e.g.*, Judiciary Act of 1789, ch. 20, § 33, 1 Stat. 73, 91; Ky. Const. of 1792, art. XII, § 16; Del. Const. of 1792, art. I, § 12; *see also* Donald B. Verrilli, Note, *The Eighth Amendment and the Right to Bail: Historical Perspectives*, 82 Colum. L. Rev. 328, 351 (1982).

Although the reformed rule provided a right to bail as a general matter, the exception for capital offenses was significant. "[A]ll serious crimes at the time of the founding" were punishable by death. *Bucklew v. Precythe*, 587 U.S. 119, 129 (2019) (citation and internal quotation marks omitted); *see, e.g.*, An Act for the Punishment of Certain Crimes Against the United States, 1 Stat. 112, 112–15 (1790); John N. Mitchell, *Bail Reform and the Constitutionality of Pretrial Detention*, 55 Va. L. Rev. 1223, 1227–29 (1969). So, even in the jurisdictions following the reformed approach, defendants facing serious charges did not enjoy a

right to bail.  They could instead be detained—and, so, disarmed—while they awaited trial.  *See Perez-Garcia*, 96 F.4th at 1182 ("[T]he historical record evinces a historical tradition of complete disarmament of criminal defendants facing serious or felony charges pending trial.").

Section 922(n)'s prohibition is comparable to the founding-era history of pretrial detention "in both why and how it burdens the Second Amendment right."  *Rahimi*, 144 S. Ct. at 1901.  Like pretrial detention, § 922(n) restricts indicted persons' rights, during the fraught period between indictment and trial, for the purpose of furthering public safety and protecting the integrity of the criminal process.  And just as bail was denied outright only for defendants facing serious charges, so § 922(n) is triggered only by indictment for a felony charge.  Section 922(n) also imposes a comparable—indeed, "less heavy-handed"—burden.  *United States v. Veasley*, 98 F.4th 906, 915 (8th Cir. 2024).  This provision simply restricts defendants' ability to receive, ship, or transfer firearms—it says nothing about possession.  So for those who already possess one or more firearms, § 922(n) represents only a slight burden on the Second Amendment right; and even for those who do not, § 922(n)'s prohibition is a lesser burden than detention or permanent disarmament.  *Cf. Rahimi*, 144 S. Ct. at 1902 ("[I]f imprisonment was permissible to respond to the use of guns to threaten the physical safety of others, then the lesser restriction of temporary disarmament that Section 922(g)(8) imposes is also permissible.").  Finally, like pretrial detention, § 922(n)'s burden expires when the criminal case is resolved.  In both justification and burden, the modern regulation finds an analogue in founding-era practices of pretrial detention.

Gore offers two reasons to doubt the analogy to pretrial detention, but neither ultimately undermines it.  First, § 922(n) applies automatically upon indictment for a felony, without any individualized determination of risk.  *Compare, e.g.*, 18 U.S.C. § 3142.  But that does not defeat § 922(n)'s facial validity.  In *Rahimi*, the Court was careful not to "suggest that the Second Amendment prohibits the enactment of laws banning the possession of guns by categories of persons thought by a legislature to present a special danger of misuse."  144 S. Ct. at 1901.  That is what Congress has done in enacting § 922(n)—it has defined, by their circumstances, a category of persons who, in its judgment, present special risks.  And that categorical judgment is comparable to founding-era approaches to pretrial detention.  As noted, about half of the States

at the time of the founding made serious offenses nonbailable. *See* Mitchell, 55 Va. L. Rev. at 1226; Funk & Mayson, 137 Harv. L. Rev. at 1843. Even where the reformed rule governed, admission to bail in capital cases was, at most, a matter of judicial discretion. *See* Funk & Mayson, 137 Harv. L. Rev. at 1843. But, at least in some of those jurisdictions, bail became unavailable (barring exceptional circumstances) once a grand jury returned an indictment establishing probable cause. *See People v. Tinder*, 19 Cal. 539, 541–46 (1862) (canvassing prior English and American authorities and agreeing, consistent with the majority view, that a valid "indictment for a capital offense does of itself furnish a presumption of the guilt of the defendant too great to entitle him to bail as a matter of right under the Constitution, *or as a matter of discretion* under the legislation of the State" (emphasis added)); *see also Hight v. United States*, 1 Morris 407, 410 (Iowa 1845); *State v. Mills*, 13 N.C. 420, 421–22 (1830); *Ex parte Tayloe*, 5 Cow. 39, 54–55 (N.Y. 1825) (opinion of Sutherland, J.); *Territory v. Benoit*, 1 Mart.(o.s.) 142, 142 (Orleans 1810). Indeed, in the 1807 treason trial of Aaron Burr, Chief Justice John Marshall stated that "he doubted extremely[] whether the court had the right to bail any person, after an indictment" for a capital offense. 1 David Robertson, *Reports of the Trials of Colonel Aaron Burr* 311 (1808); *see also People v. McCleod*, 3 Hill 635, 645 (N.Y. 1842) ("Chief Justice Marshall bailed Colonel Burr on a charge of high treason *before* he was indicted; but *after indictment* he refused to take bail . . . ."). That view is significant because federal law followed the reformed rule. *See* Judiciary Act of 1789, ch. 20, § 33, 1 Stat. 73, 91. In sum, the uniform founding-era practice was to categorically deny a right to bail to persons charged with certain serious offenses, and it seems that most jurisdictions effectively *required* pretrial detention in serious cases. *Cf. Carlson v. Landon*, 342 U.S. 524, 545 (1952) ("The Eighth Amendment has not prevented Congress from defining the classes of cases in which bail shall be allowed in this country."). Section 922(n) "fits within" that tradition. *Rahimi*, 144 S. Ct. at 1897.

That leads to Gore's second objection to the pretrial-detention analogy—he suggests that § 922(n)'s felony-indictment trigger is too broad in comparison to the class of nonbailable crimes at the founding. The Supreme Court has observed, after all, that "[m]any crimes classified as misdemeanors, or nonexistent, at common law are now felonies." *Tennessee v. Garner*, 471 U.S. 1, 14 (1985). We need not dwell on that question, however. We confront a facial challenge, so

our inquiry ends if § 922(n) "is constitutional in some of its applications." *Rahimi*, 144 S. Ct. at 1898. It is. At a minimum, it is plainly constitutional as applied to those accused of the sorts of offenses that required pretrial detention at the founding. *Cf. Perez-Garcia*, 96 F.4th at 1185.

That is not to say that a mismatch between the founding era's "serious" or "capital" crimes and today's felonies would necessarily preclude § 922(n)'s application to those indicted for less "serious" felonies today. After all, § 922(n) and founding-era pretrial detention need not be perfect "twin[s]." *Rahimi*, 144 S. Ct. at 1903; *see id.* at 1897–98. Moreover, even a founding-era defendant released on bail was not relieved of all burdens—he was answerable to his sureties to both "personally appear at . . . court" and "in the mean time keep the peace and be of good behaviour." 5 Nathan Dane, *A General Abridgment and Digest of American Law* 277 (1824); *see* Funk & Mayson, 137 Harv. L. Rev. at 1853, 1867–68. And those sureties were expected to "render him up for incarceration if they felt that he was becoming untrustworthy." Paul Lermack, *Peace Bonds and Criminal Justice in Colonial Philadelphia*, 100 Pa. Mag. Hist. & Biography 173, 179 (1976); *cf.* 4 Blackstone *294 ("[B]ail is . . . a delivery, or bailment, of a person to his sureties, upon their giving (together with himself) sufficient security for his appearance: he being supposed to continue in their friendly custody, instead of going to gaol."). So § 922(n)'s limited prohibitions might amount to a burden similar to founding-era pretrial release, making its application to defendants indicted on less "serious" charges permissible.

Ultimately, however, Gore has not brought an as-applied challenge to § 922(n). All we need to decide is whether the provision is facially valid. It is. So the district court properly denied Gore's motion to dismiss this count of the indictment.

## B.

We next consider Gore's objection to the government's peremptory strike of juror 164. Under *Batson v. Kentucky*, 476 U.S. 79, 89 (1986), a prosecutor may not use "peremptory challenges to exclude members of the venire on account of their race." *United States v. Cecil*,

615 F.3d 678, 685 (6th Cir. 2010).[3] "'We review a district court's determination of a *Batson* challenge with great deference' under the clear-error standard." *United States v. Hall*, 20 F.4th 1085, 1097 (6th Cir. 2022) (quoting *Cecil*, 615 F.3d at 685).

A *Batson* challenge involves three steps. *Miller-El v. Cockrell*, 537 U.S. 322, 328 (2003); *Purkett v. Elem*, 514 U.S. 765, 767 (1995) (per curiam). "First, a defendant must make a prima facie showing that a peremptory challenge has been exercised on the basis of race." *United States v. Atkins*, 843 F.3d 625, 631 (6th Cir. 2016) (quoting *Cockrell*, 537 U.S. at 328). If he does so, then at step two the prosecutor "must offer a race-neutral basis for striking the juror in question." *Id.* This explanation need not be "persuasive, or even plausible," so long as it is race neutral. *Purkett*, 514 U.S. at 768; *see also Braxton v. Gansheimer*, 561 F.3d 453, 459 (6th Cir. 2009) (explaining that "a prosecutor's reasons may be founded on nothing more than a trial lawyer's instincts about a prospective juror" (citation omitted)). If the prosecutor offers a "legitimate" (*i.e.*, race-neutral) reason, then at step three the court must decide "the persuasiveness of the justification." *Purkett*, 514 U.S. at 769. This requires the court to "assess the [prosecutor's] credibility under all of the pertinent circumstances, and then weigh the asserted justification against the strength of the [defendant's] prima facie case under the totality of the circumstances." *Cecil*, 615 F.3d at 686 (cleaned up). The burden of persuasion remains with the party challenging the strike. *Id.*

Gore's counsel raised a *Batson* objection to the peremptory strike of juror 164, who was "the only person of color left" in the venire. R. 57, Trial Tr., PageID 425. After the objection, the following exchange ensued:

> **Government's counsel:** Your Honor, on juror 164, it's simply a lack of life experience. Very young age. Single. From what I can tell, I'm not sure that he even lives on his own.
>
> And so, to me, I just—whenever—all things being equal, I would rather have a juror that has a little bit more life experience and has done things like rented cars or owned property.

---

[3]*Batson* interpreted the Equal Protection Clause of the Fourteenth Amendment, but its rule "applies to federal court proceedings through the equal protection component of the Fifth Amendment's Due Process Clause." *United States v. Angel*, 355 F.3d 462, 471 (6th Cir. 2004).

So, that's why—all things being equal, the lack of life experience. Because this is a very short case, that some of the issues are about possession, ownership. There's a question of who the registered owner of the vehicle was in this case. I just want somebody with a little more life experience to take those issues up.

**Gore's counsel:** Your Honor, I think he has a lot of life experience. He's a graduate of a military school. He's a member of the Army National Guard.

This is a guy that—you know, he's willing to put his face in—in the effort there, you know. He's the person who can fight and die for his country, and he's not allowed to have a drink. You know, that's a heck of a lot of life experience for somebody to step up like that, because he's a person who volunteered. He's not a draftee.

So, I think he does have some life experience, and he has an education.

**Government's counsel:** Your Honor, I would simply say that [Gore's counsel] may have a different point of view, but I've offered you a nondiscriminatory reason why I'm striking this person.

**Court:** But with the reasons you've given me, though, how is that related to this particular case?

**Government's counsel:** In this case, there is going to be issues of joint possession, constructive possession, somebody else who is a registered owner of a vehicle, and I would just want somebody who has a little bit more life experience and may have owned their vehicles and had vehicles registered in their names.

What I know about him is he's 20 years old. He still lives with his parents and has a part-time job.

**Court:** You didn't ask him any questions as to whether he owns vehicles or whether he's had vehicles registered in his name.

**Government's counsel:** I'm simply looking at the questionnaire and what I perceive as a lack of life experience.

**Gore's counsel:** I don't see anything in here about a lack of vehicles.

All the jurors are going to hear the same instructions and have to follow them as to possession and joint possession, constructive possession, and actual possession, so—he's a high school graduate.

**Court:** All right. It's a close call, but I'm going to allow you to strike him.

I don't find—don't believe that the explanations are implausible, fantastic, silly, superstitious, or otherwise reflect pretext, so I'll allow you to strike him.

**Gore's counsel:** Your Honor, I would note for the record that's the only person of color left on the panel.

**Court:** The record will so reflect. . . .

\*\*\*

**Government's counsel:** Your Honor, let me just complete the record.

I just want the Court to know that when I went through the other questionnaires—like, again, what I took, you know, the relative youth of somebody, there's another 20-year-old that I don't think they are ever going to make it up here, but that would again be somebody that I would say has very limited life experience. Those are the kind of things that I look at.

In my experience trying cases, I want someone who has just a—more understanding, has lived on their own, has owned property, has purchased vehicles, things like that.

You can think that's—you can disagree with it, but I didn't go through for discriminatory reasons and single out juror 164. I just wanted to make that record.

*Id.* at 426–29.

In this case, the district court never made an express finding as to whether Gore had made a prima facie showing of discrimination. That issue became "moot," however, once the prosecutor "offered a race-neutral explanation for the peremptory challenge[]." *Braxton*, 561 F.3d at 461 (quoting *Hernandez v. New York*, 500 U.S. 352, 359 (1991) (plurality)). And Gore does not deny that the proffered justifications for striking juror 164—his youth and relative lack of life experience—are race neutral. Gore therefore asks us to review the step-three determination: whether Gore carried his burden of proving that the prosecutor struck juror 164 because of his race. The district court said that this question was "a close call," but the court ultimately determined that the prosecutor's "explanations" were not "implausible, fantastic, silly, [or] superstitious" and did not "otherwise reflect pretext," so it rejected Gore's *Batson* challenge. R. 57, Trial Tr., PageID 428. We cannot say that this determination was clearly erroneous.

Whether "a prosecutor intended to discriminate on the basis of race" is, at bottom, "a question of historical fact." *Braxton*, 561 F.3d at 458 (citation omitted). Striking the only black juror in the venire can be a cause for concern and, if the prosecutor's proffered reason bordered on the implausible, might suggest a discriminatory purpose. That, however, was not the case

here. Gore does not, for instance, point to "a 'pattern' of strikes against black jurors." *Batson*, 476 U.S. at 97. Nor does he argue that there were other, non-black jurors of a similar age whom the prosecutor treated differently. *Cf. Miller-El v. Dretke*, 545 U.S. 231, 241 (2005) ("If a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination . . . ."). In fact, the prosecutor stated on the record that, in reviewing the jury questionnaires, he had noted the presence of another 20-year-old in the venire; the prosecutor suggested that he would have had similar concerns with that potential juror's age and lack of life experience. Gore has not disputed the accuracy of that description of the venire, and the description supports an inference that there were no other jurors of a similar age who were spared a peremptory strike. So there is no basis in the record to infer that the government treated juror 164 differently from a similar juror because of his race.

Gore offers several counterarguments, but none is persuasive. First, he contends, essentially, that the prosecutor's concerns with age and life experience were not *good* reasons for the peremptory strike. The prosecutor anticipated that issues of joint or constructive possession would be relevant at trial because the gun Gore was accused of possessing had been recovered from a car registered to someone else. So the prosecutor "just want[ed] somebody who ha[d] a little bit more life experience and may have owned their vehicles and had vehicles registered in their names." R. 57, Trial Tr., PageID 427. In Gore's view, the prosecutor's concern was unfounded because the jurors would be required to follow the law and would receive instructions on the relevant legal concepts. Gore's argument, however, does not diminish the credibility or plausibility of the prosecutor's justifications. *See Cockrell*, 537 U.S. at 339 ("Credibility can be measured . . . by how reasonable, or how improbable, the explanations are . . . ."). That *Gore* believes that jury instructions should have alleviated the prosecutor's concerns does not make it implausible that the prosecutor actually had those concerns. And the concerns are not unreasonable: there is a rational connection between a juror's age and life experience and the likelihood that he has a well-developed understanding of the social and practical dynamics of vehicle ownership or possession. "[A] prosecutor ordinarily is entitled to exercise permitted peremptory challenges for any reason at all, as long as that reason is related to his view concerning the outcome of the case to be tried." *Batson*, 476 U.S. at 89 (citation and internal

quotation marks omitted). Gore has not shown that the proffered reason here is so improbable that it had to be pretextual.

Gore next points out that the prosecutor did not ask juror 164 any questions about his age or his experiences with vehicle registration, ownership, or possession during voir dire and did not seek such information in the juror questionnaire. But the prosecutor's failure to do so does not "affirmatively show[]" that the justifications were pretextual. *Lancaster v. Adams*, 324 F.3d 423, 433 (6th Cir. 2003). Age, after all, is a self-explanatory characteristic. True, the prosecutor could have asked specifically about experience with vehicle registration, ownership, or possession, but it was not unreasonable for the prosecutor to infer at the outset that any such experience would have been comparatively limited given juror 164's age. And, significantly, Gore does not claim that the prosecutor asked *other* jurors about such experiences. In fact, the prosecutor engaged in relatively little direct questioning with the jurors. He posed several questions to the venire regarding biases and preconceptions of the criminal justice system, but he had only one back-and-forth exchange with a particular juror—following up on a question about personal beliefs about the Second Amendment. The prosecutor's questioning, in other words, was not so detailed about other matters that his failure to ask about *this* matter suggests a lack of genuine interest.

The cases Gore cites do not alter this conclusion. In *Dretke*, the Supreme Court stated that a prosecutor's "failure to ask" a panelist follow-up questions about his brother's conviction for a food-stamp crime "undermine[d] the persuasiveness of the claimed concern." 545 U.S. at 250 n.8. But the details and relevance of a family member's criminal history are less facially discernible than a juror's age. Moreover, the circumstances of *Dretke* were far more suggestive of discriminatory purpose than those here: of the twenty black members of the venire, the prosecutor there struck nine for cause and ten peremptorily, and treated similarly situated black and non-black jurors differently. *Id.* at 240–41, 247. In *United States v. Odeneal*, we faulted the prosecutor for failing to ask follow-up questions about an asserted reason for the strike: the prosecutor worried that the juror would be unable to focus because of an ongoing divorce. 517 F.3d 406, 418, 420–21 (6th Cir. 2008). Again, however, the details and relevance of a juror's divorce proceedings are not facially obvious—especially because the parties knew of the

juror's divorce only from a questionnaire that "had been submitted one year prior to the trial," making that information likely outdated. *Id.* at 418. And in *Atkins*, we found that the prosecutor's concerns with a black juror's employment history and family responsibilities were pretextual. 843 F.3d at 637. The prosecutor justified a peremptory strike on the ground that the juror had recently changed jobs and had eight children to care for, but we observed that the prosecutor never expressed concerns about two empaneled white jurors with six and four children, respectively, or about another empaneled white juror who had been searching for a job just one month before voir dire. *Id.* at 637–38. In addition to that discrepancy, the prosecutor "failed to ask obvious follow-up questions that might have confirmed or alleviated the government's suspicions, such as inquiring into [the juror's] child care arrangements, or the reasons [he] left Krispy Kreme to begin work as a custodian." *Id.* at 638. Here, by contrast, there is no suggestion that the prosecutor was inconsistent in acting on his concerns with age and life experience; indeed, as noted above, the record supports the inference that there were no jurors of a similar age who were spared a peremptory strike.

As further evidence of pretext, Gore asserts that the issue of the vehicle's owner "never even came up" at trial. Appellant Br. at 18. This argument presumes that a prosecutor's credibility turns on his ability to perfectly predict how the trial will unfold. That is not a fair expectation. *Cf. Cockrell*, 537 U.S. at 339 ("Credibility can be measured . . . by whether the proffered rationale has some basis in accepted trial strategy."). The prosecutor asserted that he was concerned with the fact that police found the gun Gore was accused of possessing in a car he didn't own, at a time when he was not present. Those issues did come up at trial. The government's first witness testified that the gun was found in Mikael Waters' car and that nothing in the car connected Gore to the scene. The government's second witness explained why he believed that Gore and Waters were in the same friend group, discussed evidence revealing that Gore had left the gun in Waters's car, and recounted the interview in which Gore admitted to having "touched" the gun. And in closing arguments, the prosecution urged the jury to find that Gore left the gun "in someone else's car," but the defense argued that the evidence instead showed that two other individuals had left the gun in the car. R. 57, Trial Tr., PageID 504. Whether Gore had put the gun in the car was a (if not *the*) central factual issue. Given the basic

evidentiary fault line in the case, it is not implausible that the prosecutor identified the registration and ownership of the vehicle as potentially relevant issues before trial.

We owe "great deference" to the district court's determination that, although this was a close call, the prosecutor did not strike juror 164 because of his race. *Cecil*, 615 F.3d at 685 (citation omitted). The court did not clearly err in that factual determination.

\* \* \*

We AFFIRM.