**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**September 3, 2025**

**Christopher M. Wolpert**
**Clerk of Court**

<u>PUBLISH</u>

### UNITED STATES COURT OF APPEALS

### FOR THE TENTH CIRCUIT

_____

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

ALEXANDER JON OGILVIE,

    Defendant - Appellant.

No. 24-4089

_____

**Appeal from the United States District Court**
**for the District of Utah**
**(D.C. No. 2:23-CR-00063-TC-1)**

_____

Jessica Stengel, Assistant Federal Public Defender (Scott Keith Wilson, Federal Public Defender, with her on the briefs), Salt Lake City, Utah, for Defendant-Appellant.

Nathan H. Jack, Assistant United States Attorney (Felice John Viti, United States Attorney, with him on the brief), Salt Lake City, Utah, for Plaintiff-Appellee.

_____

Before **TYMKOVICH**, **PHILLIPS**, and **MORITZ**, Circuit Judges.

_____

**PHILLIPS**, Circuit Judge.

_____

Alexander Jon Ogilvie was charged with illegal receipt of a firearm by a person under indictment, in violation of 18 U.S.C. § 922(n). He moved to dismiss the indictment, arguing that § 922(n) is facially unconstitutional under

the framework of *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022). The district court denied that motion. Ogilvie then pleaded guilty to the § 922(n) count but reserved his right to appeal. He was sentenced to 21 months' imprisonment.

On appeal, Ogilvie again challenges the constitutionality of § 922(n). He argues that § 922(n) facially violates the Second Amendment because the statute is inconsistent with the nation's historical tradition of firearm regulation. We disagree. In line with other circuits that have grappled with this issue, we hold that § 922(n) is constitutional on its face. Exercising jurisdiction under 28 U.S.C. § 1291, we affirm.

## BACKGROUND

### I.　Factual Background

Despite his young age, Ogilvie has accumulated a significant criminal record through his misuse of firearms. Three incidents led to this case. First, at age sixteen, Ogilvie was adjudicated delinquent for shooting in the direction of a person, a second-degree felony under Utah law. The adjudication made Ogilvie a "Category I restricted person," meaning that Utah law bars him from possessing any firearms.[1] Utah Code Ann. § 76-10-503(1)(a)(iv), (2)(a) (West 2018). Second, in April 2022, an officer found Ogilvie with a Glock 19

---

[1] Under Utah law, a "Category I restricted person" includes a person adjudicated as a minor within the last ten years for an offense that would have qualified as a violent felony if committed by an adult. Utah Code Ann. § 76-10-503(1)(a)(iv), (2)(a) (West 2018).

2

handgun despite his restricted status. For that conduct, Ogilvie was charged with the felony offense of possessing a dangerous weapon by a restricted person under Utah law. *Id.* This charge failed to deter his continued use of firearms. On the day of his arraignment, Ogilvie purchased yet another firearm—a Taurus handgun. Third, in October 2022, officers responded to a report of gunshots and soon located a bullet-ridden vehicle. The officers later found Ogilvie at a nearby parking garage with the Taurus handgun in his waistband. Ogilvie admitted to shooting the gun about six times at a group of people.

## II.    Procedural History

After the October 2022 shooting, a federal grand jury returned an indictment against Ogilvie, charging him with illegal receipt of a firearm by a person under indictment, in violation of 18 U.S.C. § 922(n). The federal indictment alleged that he had willfully received the Taurus handgun while indicted in Utah for the felony offense of possessing a dangerous weapon by a restricted person.[2]

Ogilvie moved to dismiss the indictment. He argued that § 922(n) is facially unconstitutional under the Second Amendment. Specifically, he claimed that the Second Amendment protects the right of an individual under

---

[2] Because of the October 2022 shooting, state prosecutors charged Ogilvie with one count of possession of a dangerous weapon by a restricted person and five counts of felony discharge of a firearm.

indictment to receive firearms. The district court disagreed with Ogilvie and denied his motion. *United States v. Ogilvie*, No. 2:23-CR-00063-TC, 2024 WL 2804504, at *1 (D. Utah May 31, 2024). The court determined that though the Second Amendment presumptively protected Ogilvie's conduct, § 922(n) "is consistent with the Nation's historical tradition of firearm regulation." *Id.* at *2 (citation modified). The district court cited two examples of historical analogues to § 922(n): "1) colonial laws disarming groups of people perceived as dangerous; and 2) surety laws." *Id.* at *3; *see id.* at *4. According to the district court, these examples demonstrated that "the historical regulation of firearms" allowed for "a limited restriction on the right to self-defense" if an individual "pose[d] a potential threat" to others. *Id.* at *4–5. The court reasoned that § 922(n), which bars indicted individuals from receiving firearms, fell within this historical tradition. *Id.* For these reasons, the district court held that § 922(n) is constitutional and declined to dismiss the indictment.[3] *Id.* at *7.

Ogilvie then entered a conditional guilty plea to the § 922(n) count. He reserved his right to appeal the denial of his motion to dismiss the indictment. The district court later sentenced Ogilvie to 21 months' imprisonment. Ogilvie timely appealed.

---

[3] The district court concluded that a constitutional challenge to § 922(n) as applied to Ogilvie would also fail. *Ogilvie*, 2024 WL 2804504, at *5. Before us, Ogilvie clarifies that he never raised an as-applied challenge in the district court and that he does not do so on appeal either. He mounts only a facial attack on the constitutionality of § 922(n).

**STANDARD OF REVIEW**

We evaluate the district court's denial of a motion to dismiss an indictment for abuse of discretion. *United States v. Stevens*, 881 F.3d 1249, 1252 (10th Cir. 2018). "An error of law is per se an abuse of discretion[.]" *Id.* (citation modified). And we review de novo any constitutional challenge to a federal statute. *United States v. Doe*, 58 F.4th 1148, 1153 (10th Cir. 2023).

**DISCUSSION**

On appeal, Ogilvie revives his sole argument—that § 922(n) is facially unconstitutional under the Second Amendment. He contends that no historical tradition supports restricting the Second Amendment rights of indicted individuals. We start with the relevant legal standard and then analyze the constitutionality of § 922(n).

I.   **Legal Standard**

The Second Amendment protects "an individual right to keep and bear arms." *Dist. of Columbia v. Heller*, 554 U.S. 570, 595 (2008). "Like most rights, the right secured by the Second Amendment is not unlimited." *Id.* at 626. The Supreme Court has cautioned that the Second Amendment does not amount to "a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Id.* Instead, the Court has endorsed firearm regulations that restrict conduct unprotected by the Second Amendment. *See, e.g.*, *id.* at 626–27 ("[N]othing in [*Heller*] should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons

and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms."); *United States v. Rahimi*, 602 U.S. 680, 684–85, 700 (2024) (holding that § 922(g)(8), which bars gun ownership for individuals under domestic-violence restraining orders, is facially constitutional). These acceptable restrictions underscore the Court's refrain that the Second Amendment protects the rights of "law-abiding" citizens. *See, e.g.*, *Heller*, 554 U.S. at 635; *Bruen*, 597 U.S. at 9.

In *Bruen*, the Supreme Court established a two-step framework for reviewing the constitutionality of firearm regulations. 597 U.S. at 19, 24. At step one, the party challenging the regulation must show that the plain text of the Second Amendment covers the regulated conduct. *Id.* at 24. If the party meets this burden, then the Second Amendment "presumptively protects that conduct." *Id.* At step two, the burden shifts to the government to justify how its regulation of that conduct falls outside the scope of the Second Amendment's protected right. *Id.* The government meets this burden if it can "demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Id.* at 17. With the relevant legal standard in mind, we review Ogilvie's constitutional challenge.

## II.    Analysis

Ogilvie challenges the constitutionality of § 922(n). To prevail on a facial challenge, Ogilvie must "establish that no set of circumstances exists

6

under which the Act would be valid." *Rahimi*, 602 U.S. at 693 (citation modified). The Supreme Court has described this type of challenge as "the most difficult challenge to mount successfully[.]" *Id.* (citation modified). That is because Ogilvie's facial challenge fails so long as the government shows that § 922(n) "is constitutional in some of its applications." *Id.* And "when legislation and the Constitution brush up against each other, a court's task is to seek harmony, not to manufacture conflict." *Id.* at 701 (citation modified).

We turn to the statute at issue: § 922(n) prohibits "any person who is under indictment for a crime punishable by imprisonment for a term exceeding one year" from "ship[ping] or transport[ing] in interstate or foreign commerce any firearm or ammunition or receiv[ing] any firearm or ammunition which has been shipped or transported in interstate or foreign commerce."[4] The district court analyzed § 922(n) under *Bruen*'s two-step framework, concluding that (1) the Second Amendment presumptively protects the conduct prohibited by § 922(n), but that (2) § 922(n) is consistent with the nation's history and tradition of firearm regulation. *Ogilvie*, 2024 WL 2804504, at *2. Because we agree with the district court at *Bruen*'s second step, we affirm the

---

[4] "The term 'indictment' includes an indictment or information in any court under which a crime punishable by imprisonment for a term exceeding one year may be prosecuted." 18 U.S.C. § 921(a)(14). A crime punishable by imprisonment for over a year is generally considered a felony. *See, e.g.*, 18 U.S.C. § 3156(a)(3); *Davis v. United States*, 328 U.S. 582, 585 n.2 (1946); *United States v. Minnick*, 949 F.2d 8, 9 (1st Cir. 1991) (citing 18 U.S.C. § 922(g)(1)).

constitutionality of § 922(n). We expound on our decision at each step of the *Bruen* framework.

### A.    *Bruen* Step One

At step one, *Bruen* instructs us to determine whether the plain text of the Second Amendment covers Ogilvie's conduct.[5] 597 U.S. at 17. The Second Amendment states as follows: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms shall not be infringed." U.S. Const. amend. II. The district court ruled that the Second Amendment's plain text encompassed Ogilvie's conduct—receiving a firearm as a person under indictment. *Ogilvie*, 2024 WL 2804504, at *2. For this step, the court noted that it had "previously found that 'the people' protected by the Second Amendment includes citizens who have committed felonies." *Id.* (citing *United States v. Carrero*, 635 F. Supp. 1210, 1212 (D. Utah 2022); *United States v. Espinoza-Melgar*, 687 F. Supp. 3d 1196, 1201–02 (D. Utah 2023)). Given that its caselaw treats felons as part of "the people," the district court reasoned that Ogilvie, as a person under indictment, must fall within "the people" who have a right "to keep and bear Arms" as well. *See id.* The district

---

[5] To overcome a facial challenge, "the Government need only demonstrate that [the challenged statute] is constitutional in some of its applications." *Rahimi*, 602 U.S. at 693. So if § 922(n) is constitutional as applied to the facts of Ogilvie's case, that defeats a facial challenge to § 922(n) as well. *Id.*

8

court therefore concluded that "the Constitution presumptively protects [Ogilvie's] conduct." *Id.* (quoting *Bruen*, 597 U.S. at 24).

On appeal, the government has not argued that the district court erred at this step of the *Bruen* analysis. The parties instead focus their dispute on *Bruen*'s second step. Because the second step independently resolves this appeal, we will assume without deciding that the Second Amendment's plain text covers Ogilvie's conduct. *United States v. Quiroz*, 125 F.4th 713, 717 (5th Cir. 2025); *see United States v. Gore*, 118 F.4th 808, 813–14 (6th Cir. 2024) (concluding that the Second Amendment presumptively protects indicted individuals' right to bear arms).[6]

---

[6] In *United States v. Williams*, the Sixth Circuit reviewed the constitutionality of 18 U.S.C. § 922(g)(1), which prohibits felons from possessing firearms. 113 F.4th 637, 642–43 (6th Cir. 2024). The Sixth Circuit determined that *Bruen* and *Rahimi* abrogated its prior caselaw upholding § 922(g)(1) and therefore analyzed the constitutionality of § 922(g)(1) under *Bruen*'s two-step test. *Id.* at 644–45, 647–48. At step one, the Sixth Circuit concluded that "the people," as used in the Second Amendment, includes felons and that the Second Amendment presumptively protects a felon's right to bear arms. *Id.* at 649. *Gore* later relied on *Williams*'s step-one analysis when reviewing a constitutional challenge to § 922(n). *Gore*, 118 F.4th at 813–14 (citing *Williams*, 113 F.4th at 649). There, the Sixth Circuit reasoned that if "the people" includes felons, then it must also include individuals under indictment. *Id. Gore* and *Williams* both upheld the constitutionality of their respective statutes at issue. *Id.* at 817; *Williams*, 113 F.4th at 662–63. Like the Sixth Circuit, we also reaffirmed the constitutionality of § 922(g)(1) after *Bruen* and *Rahimi*. *Vincent v. Bondi*, 127 F.4th 1263, 1264 (10th Cir. 2025), *petition for cert. filed*, No. 24-1155 (U.S. May 8, 2025). But we departed from the Sixth Circuit's approach because we determined that our pre-*Bruen* precedent remained viable in upholding § 922(g)(1). *Id.* at 1264–66 (citing *United States v. McCane*, 573 F.3d 1037, 1047 (10th Cir. 2009)). We therefore

(*footnote continued*)

### B.    *Bruen* Step Two

At step two, we must determine whether § 922(n) "is consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 24. Since *Heller*, the Supreme Court has entrenched an originalist inquiry, requiring us to review "'historical precedent' from before, during, and even after the founding" for any "comparable tradition of regulation."[7] *Id.* at 27 (quoting *Heller*, 554 U.S. at 631). Though some historical precursors may easily map onto their modern regulatory counterparts, others "may require a more nuanced approach" due to "unprecedented societal concerns or dramatic

---

declined to engage in *Bruen*'s two-step analysis and never reached the issue of whether "the people" includes felons. *Id.* at 1266.

[7] The Supreme Court has yet to comment on whether we should rely on "the prevailing understanding of an individual right" from the founding era or from the Reconstruction era. *Rahimi*, 602 U.S. at 692 n.1 (quoting *Bruen*, 597 U.S. at 37). Because neither party argues that founding-era precedent conflicts with Reconstruction-era precedent, we need not decide this issue here. *See Bruen*, 597 U.S. at 25 n.6 (stating that under the party-presentation principle, courts may "decide a case based on the historical record compiled by the parties"). Though we resolve this appeal using precedent mainly from the founding era, this case does not amount to a preference for founding-era precedent over Reconstruction-era precedent. *See Nat'l Rifle Ass'n v. Bondi*, 133 F.4th 1108, 1155 n.12 (11th Cir. 2025) (Rosenbaum, J., concurring) ("[H]istorical evidence suggests the right to keep and bear arms served different purposes and, thus, had different meanings when our predecessors ratified it in the Second and Fourteenth Amendments, respectively."), *petition for cert. filed sub nom.*, *Nat'l Rifle Ass'n v. Glass*, No. 24-1185 (U.S. May 16, 2025); *Lara v. Comm'r Pa. State Police*, 130 F.4th 65, 66 (3d Cir. 2025) (Krause, J., dissenting) ("[T]he states' understanding of the Second Amendment at the time of the 'Second Founding'—the moment in 1868 when they incorporated the Bill of Rights against themselves—is part of the Nation's historical tradition of firearms regulation informing the constitutionality of modern-day regulations." (citation modified)).

10

technological changes" since the founding. *Id.* As recognized by the Supreme Court, the Second Amendment "can, and must, apply to circumstances beyond those the Founders specifically anticipated." *Id.* at 28. In line with this principle, the Court has reiterated that the government meets its step-two burden by "identify[ing] a well-established and representative historical *analogue*[.]" *Id.* at 30. The historical precursor "need not be a 'dead ringer' or a 'historical twin'" to the modern regulation; it just needs to be sufficiently analogous "to pass constitutional muster." *Rahimi*, 602 U.S. at 692 (quoting *Bruen*, 597 U.S. at 30). On the flip side, we may "not uphold every modern law that remotely resembles a historical analogue, because doing so risks endorsing outliers that our ancestors would never have accepted." *Bruen*, 597 U.S. at 30. (citation modified). The Court described this balance as "neither a regulatory straightjacket nor a regulatory blank check." *Id.*

In comparing a modern regulation to its historical precursors, we "must ascertain whether the new law is 'relevantly similar' to laws that our tradition is understood to permit[.]" *Rahimi*, 602 U.S. at 692 (quoting *Bruen*, 597 U.S. at 29). That inquiry demands "at least two metrics" of comparison—"*how* and *why* the regulations burden a law-abiding citizen's right to armed self-defense." *Bruen*, 597 U.S. at 29 (emphasis added). First, the "how": the modern regulation and its historical precursor must impose comparable burdens on the Second Amendment right. *Id.* Second, the "why": the modern regulation and historical precursor must have comparable justifications for burdening the

11

Second Amendment right. *Id.* At bottom, we ask whether the challenged regulation is "consistent with the principles that underpin our regulatory tradition." *Rahimi*, 602 U.S. at 692. If consistent, the challenged regulation comports with the Second Amendment.

At this step, the government argues that § 922(n) falls within the tradition of firearm regulations permitted under the Second Amendment. The government contends that § 922(n) is "relevantly similar" to a historical analogue: laws that disarmed indicted persons through pretrial detention or bail.[8] We review each metric—the burden and its justification—to compare § 922(n) with its historical precursors.[9]

### 1.    How: The Burden on the Second Amendment Right

We first examine whether § 922(n) and its historical precursors exert comparable burdens on the Second Amendment right. *Bruen*, 597 U.S. at 29. As discussed, § 922(n) bars "any person who is under indictment for a crime

---

[8] The parties also dispute whether § 922(n) is relevantly similar to going-armed laws and laws that disarmed individuals considered dangerous to society. Because we conclude that laws on pretrial detention and bail form a sufficient historical analogue to § 922(n), we need not reach these issues.

[9] We independently analyze § 922(n) and its historical precedent under *Bruen*'s framework. But we recognize that the Fifth and Sixth Circuits have upheld § 922(n) as facially constitutional and consider these decisions persuasive. *Quiroz*, 125 F.4th at 715 (5th Cir. 2025); *Gore*, 118 F.4th at 815–17 (6th Cir. 2024). No other circuit has directly addressed the facial validity of § 922(n) under the Second Amendment. *See also United States v. Holden*, 70 F.4th 1015, 1017–18 (7th Cir. 2023) (opining that a facial challenge to § 922(n) would likely fail but noting that the issue was not before the court).

punishable by imprisonment for a term exceeding one year" from shipping, transporting, or receiving any firearm or ammunition through interstate commerce. This burden is both "temporary, and limited[.]" *Gore*, 118 F.4th at 814. The statute's prohibitions "apply only to the period between indictment and trial." *Quiroz*, 125 F.4th at 719. Beyond that, § 922(n) has no force. The statute also prohibits only three actions in relation to firearms—shipping, transporting, and receiving. § 922(n). An individual under indictment can retain and even use the firearms already in his possession. *See id.* Given its temporary restriction and limited scope, § 922(n) does not intrude on "the '*central component*' of the Second Amendment right, the right of armed self-defense." *Gore*, 118 F.4th at 814 (quoting *Bruen*, 597 U.S. at 29).

Next, the historical analogue. Pretrial detention at the founding also burdened the Second Amendment right. Like § 922(n), pretrial detention imposed a temporary loss of liberty for individuals who were charged but not yet convicted of any crime. *See* Kellen R. Funk & Sandra G. Mayson, *Bail at the Founding*, 137 Harv. L. Rev. 1816, 1832 (2024). This loss of liberty included complete disarmament—an even greater burden on the Second Amendment right than that imposed by § 922(n). *Quiroz*, 125 F.4th at 718–19 ("[P]retrial detention naturally entailed the loss of a wide range of liberties— including the loss of access to weapons." (citation modified)); *see State v. Buzzard*, 4 Ark. 18, 21 (Ark. 1842) (opinion of Ringo, C.J.) ("Persons accused of crime, upon their arrest, have constantly been divested of their arms, without

the legality of the act having ever been questioned."). Pretrial detention at the founding therefore demonstrates a historical tradition of restricting access to firearms for those accused of serious crimes. *Quiroz*, 125 F.4th at 719.

Ogilvie counters that pretrial detention serves as an insufficient historical analogue to § 922(n). According to Ogilvie, pretrial detention occurred only after a neutral magistrate assessed the individualized need for detention, while § 922(n) categorically bars all individuals under felony indictment from receiving firearms. He therefore insists that § 922(n) imposes a greater burden on the Second Amendment right. This argument paints an incomplete picture of pretrial detention. At the founding, two legal models for bail existed in the states. Funk & Mayson, *supra*, at 1832, 1835. About half the states inherited England's common-law model, which mandated pretrial detention for those charged with serious crimes. *Id.* at 1832, 1842–43; *see, e.g.*, *State v. Hill*, 6 S.C.L. 242, 246 (S.C. 1812) (opinion of Smith, J.) ("The general rule is, not to admit to bail after bill found, in capital cases."). These crimes included treason, arson, prison breaking, murder, and horse-stealing. *See* Joseph Chitty, A Practical Treatise on the Criminal Law 95–96 (Isaac Riley et al. 1819). Individuals who confessed to committing felonies were also detained pending trial. *Id.* The common-law model reveals that at the founding, the Second Amendment existed in harmony with a categorical approach toward complete disarmament for those accused of serious crimes. *Id.* at 106–07 ("When a person has been apprehended for an offence that is not bailable, and there

14

appears to be any ground for the charge, . . . he must be committed." (citation omitted)). These states required no individualized assessment before burdening the Second Amendment right—a categorical judgment comparable to that of § 922(n)'s firearm restrictions. *See Gore*, 118 F.4th at 816.

The other half implemented the dissenter model, which derived from attempts to reform the common-law model's more limited access to bail.[10] Funk & Mayson, *supra*, at 1835, 1842–43. This model eliminated mandatory detention and enlarged the category of offenses with mandatory bail. *Id*. at 1843. But even under the dissenter model, individuals charged with capital offenses had no right to bail. *Id*. That category of offenses was expansive, because "death was 'the standard penalty for all serious crimes' at the time of the founding." *Bucklew v. Precythe*, 587 U.S. 119, 129 (2019) (quoting Stuart Banner, The Death Penalty: An American History 23 (2002)). For example, at the federal level, the First Congress punished the following crimes with death by hanging: "forgery of United States securities, running away with a ship or vessel, or any goods or merchandise to the value of fifty dollars, treason, and murder on the high seas[.]" *Harmelin v. Michigan*, 501 U.S. 957, 980–81 (1991) (citation modified). Various states under this model also imposed the

---

[10] "Every state that entered the Union after 1789, except West Virginia and Hawaii, guaranteed a right to bail in its original state constitution." Funk & Mayson, *supra*, at 1842 (citation modified). The First Congress adopted this right as well in the Judiciary Act of 1789. *Id*. But the dissenter model did not emerge as the consensus model until at least the twentieth century. *See id*.

death penalty for offenses such as burglary at night, murder, arson at night, robbery, and knowingly buying stolen goods.[11] *See, e.g.*, 10 The Statutes at Large of Pennsylvania from 1682 to 1801, at 110 (James T. Mitchell & Henry Flanders 1904); 11 The Statutes at Large of Pennsylvania from 1682 to 1801, at 111–12 (James T. Mitchell & Henry Flanders 1904); 1784 Mass. Acts 125 (An Act Against Murder and Manslaughter, ch. 44), 128 (An Act Against Burglary, ch. 48), 134–35 (An Act for the Punishment of Robbery, ch. 52), 157 (An Act Against Arson, and Other Malicious Burning, ch. 58). Under the dissenter model, a magistrate detained individuals charged with capital offenses on a discretionary basis. Funk & Mayson, *supra*, at 1843.

Though the dissenter-model states took a liberal approach to bail after a criminal charge, they did not uniformly maintain this approach after the indictment. Several states resumed the use of mandatory pretrial detention post-indictment because of the grand jury's probable-cause determination. *See People v. Tinder*, 19 Cal. 539, 543 (Cal. 1862) ("[A]n indictment for a capital offense does of itself furnish a presumption of the guilt of the defendant too great to entitle him to bail as a matter of right under the Constitution, or as a matter of discretion under the legislation of the State."); *State v. Mills*, 13 N.C. 420, 421–22 (N.C. 1830) ("For after bill found, a Defendant is presumed to be

---

[11] We rely on the listed capital offenses solely to demonstrate the expansive nature of pretrial detention—and in turn, disarmament—at the founding.

guilty to most, if not to all purposes, except that of a fair and impartial trial before a *petit* jury. This presumption is so strong, that in the case of a capital felony, the party cannot be let to bail."); *Territory v. Benoit*, 1 Mart. (o.s.) 142, 142–43 (La. 1810) ("[T]he judges cannot help considering the finding of the Grand Jury as too great a presumption of the defendant's guilt to bail him."); *see also* Thomas F. Davidson, *The Power of Courts to Let to Bail*, 24 Am. L. Reg. 1, 3 (1876) (noting that Chief Justice Marshall permitted bail for Aaron Burr after he was charged with treason but refused bail after the indictment). Even in Pennsylvania, which arguably had the most liberal approach to bail at the founding, lack of financial or social capital prevented many accused individuals from accessing bail. *See* Funk & Mayson, *supra*, at 1824, 1854. A criminal charge amounted to detention for any defendant without sureties.[12] *Id.* at 1855. So in practice, dissenter-model states maintained a two-tiered system—bail for those with sureties and pretrial detention for those without.[13] *Id.* at 1825, 1867.

---

[12] A surety refers to an individual who agreed to forfeit a specific monetary amount should the defendant fail to appear for trial. Funk & Mayson, *supra*, at 1823.

[13] Though Ogilvie discusses bail and surety law as two separate concepts, the historical record reveals that surety law formed an integral—and inextricable—part of bail. Under both the common-law and dissenter models, a defendant on bail had to (1) promise to appear for trial, (2) pledge to forfeit a specific sum of money if the defendant did not appear, and (3) have one or two sureties agree to forfeit a sum of money if the defendant did not appear. Funk & Mayson, *supra*, at 1819, 1823, 1842, 1891; *see, e.g.*, N.C. Const. of 1776, art. XXXIX; Del. Const. of 1792, art. I, § 12; Conn. Const. of 1818, art. I, § 14.

We acknowledge some differences between § 922(n) and pretrial detention at the founding. The list of serious crimes or capital offenses may not exactly match the list of modern-day felonies. And some states under the dissenter model may not have prescribed automatic detention for those indicted for capital crimes. But § 922(n) does not need to be identical to these founding-era laws. *Rahimi*, 602 U.S. at 698 ("Section 922(g)(8) is by no means identical to these founding era regimes, but it does not need to be."). *Bruen* instructs us to identify a "historical *analogue*, not a historical *twin*." 597 U.S. at 30; *see Rahimi*, 602 U.S. at 695–98 (concluding that surety laws and going-armed laws were historical analogues to § 922(g)(8)). At the founding, about half the states mandated pretrial detention for serious crimes, other states mandated pretrial detention for capital offenses post-indictment, and the rest prevented many accused individuals from accessing bail in practice. Given this historical tradition of disarmament through pretrial detention, we find that pretrial detention is relevantly similar to § 922(n) in terms of the burden imposed on the Second Amendment right.[14]

---

[14] Ogilvie—in an undeveloped argument—mentions that "[§] 922(n) is at odds with [18 U.S.C.] § 3142," the statute that currently governs federal pretrial release and detention. Op. Br. at 34. Because *Bruen* requires a *historical* analogue, the better inquiry is whether pretrial detention at the founding is relevantly similar to § 922(n). *Bruen*, 597 U.S. at 27. "[W]e must . . . guard against giving postenactment history more weight than it can rightly bear," so any similarity or difference between § 922(n) and § 3142 has little bearing on the constitutionality of § 922(n). *Id.* at 35.

Ogilvie also cites *Rahimi* for the proposition that disarmament requires an individualized judicial determination. We disagree. In *Rahimi*, the Supreme Court reviewed whether surety laws and going-armed laws served as historical analogues to § 922(g)(8), which bars gun ownership for individuals with domestic-violence restraining orders.[15] 602 U.S. at 695–98. The Court noted the similar burdens that § 922(g)(8), surety laws, and going-armed laws imposed on the Second Amendment right: they all required a judicial determination on whether a particular defendant was a credible threat to another before disarming that defendant. *Id.* at 699. But in making this observation, the Court specifically disclaimed any "suggest[ion] that the Second Amendment prohibits the enactment of laws banning the possession of guns by categories of persons thought by a legislature to present a special danger of misuse[.]" *Id.* at 698. Nor did the Court assert that pretrial detention at the founding required the same individualized assessment before disarming those charged with serious

---

[15] Surety laws "authorized magistrates to require individuals suspected of future misbehavior to post a bond." *Rahimi*, 602 U.S. at 695. These laws were "invoked to prevent all forms of violence, including spousal abuse." *Id.* Individuals who failed to post bond were jailed, and individuals who broke the peace forfeited the bond. *Id.* Going-armed laws "prohibited riding or going armed, with dangerous or unusual weapons, to terrify the good people of the land." *Id.* at 697 (citation modified). Individuals who violated going-armed laws had to forfeit their arms or were imprisoned. *Id.*

19

offenses. *Rahimi*'s comparison of § 922(g)(8) to surety and going-armed laws therefore lacks relevance for our comparison of § 922(n) to pretrial detention.[16]

For these reasons, we conclude that § 922(n) imposes a burden comparable to that of pretrial detention at the founding.

### 2.     Why: The Justification for the Burden

We next review whether § 922(n) and pretrial detention have comparable justifications for burdening the Second Amendment right. *Bruen*, 597 U.S. at 29. Section 922(n) protects the public from indicted individuals' misuse of

---

[16] Ogilvie cites *United States v. Perez-Garcia*, 96 F.4th 1166 (9th Cir. 2024), for the same proposition—that the Second Amendment requires an individualized determination of dangerousness for disarmament. Unlike this case, *Perez-Garcia* dealt with the constitutionality of 18 U.S.C. § 3142(c)(1)(B)(viii), which allows courts to bar defendants from possessing firearms as a condition of pretrial release. *Id.* at 1171. The Ninth Circuit reviewed surety laws as historical analogues to § 3142(c)(1)(B)(viii). *Id.* at 1188–90. Like the Supreme Court in *Rahimi*, the Ninth Circuit highlighted how "regulations that authorize disarmament only after individualized findings of dangerousness by public officials are within the heartland of legislative power to disarm those who are not law-abiding, responsible citizens." *Id.* at 1190. The Ninth Circuit focused on this individualized assessment because § 3142(c)(1)(B) requires that assessment before barring anyone from possessing firearms. *Id.* at 1189–90. But the Ninth Circuit never stated that an individualized assessment was necessary to pass muster under the Second Amendment. It commented only on how the individualized assessment in § 3142(c)(1)(B) aligned with the historical tradition of surety laws, which likewise involved an individualized assessment before disarmament. *Id.* at 1190. In fact, the Ninth Circuit even acknowledged that "founding-era legislatures categorically disarmed groups whom they judged to be a threat to the public safety." *Id.* at 1189 (quoting *Kanter v. Barr*, 919 F.3d 437, 458 (7th Cir. 2019) (Barrett, J., dissenting), *abrogated by Bruen*, 597 U.S. 1). Because the Ninth Circuit reviewed the constitutionality of a different statute with different requirements for disarmament, we conclude that *Perez-Garcia* has limited applicability to this case.

firearms. In passing § 922, Congress expressed concern over "the ease with which any person can acquire firearms" and considered this access "a significant factor in the prevalence of lawlessness and violent crime in the United States." S. Rep. No. 90-1097, at 2197–98 (1968). As recognized by the Sixth Circuit, special concerns exist when individuals transfer firearms *after* their indictment. *Gore*, 118 F.4th at 814. These concerns include witness tampering, victim intimidation, evidence disposal, and the facilitating of another's criminal acts. *Id.* Section 922(n) therefore addresses the unique public safety issues that may arise between indictment and trial. *Id.*

Like § 922(n), pretrial detention and bail at the founding addressed public safety concerns. Funk & Mayson, *supra*, at 1853; Anthony Highmore, Jr., A Digest of the Doctrine of Bail in Civil and Criminal Cases vii (1783) (stating that bail should preserve "the safety of the people . . . against the lawless depredations of atrocious offenders" and is therefore not "universally allowed . . . in criminal cases"); *see also Gore*, 118 F.4th at 814; *Quiroz*, 125 F.4th at 718; *United States v. Perez-Garcia*, 96 F.4th 1166, 1182 (9th Cir. 2024); *cf. United States v. Salerno*, 481 U.S. 739, 750–51 (1987) (holding that § 3142(f), which allows courts to consider public safety when setting bail, is facially constitutional). Pretrial detention entailed the most significant loss of liberties before conviction, including total disarmament. Individuals released on bail and their sureties had to guarantee "good behavior" as a condition for release. Funk & Mayson, *supra*, at 1853. The historical record reflects "a very

fuzzy line between bail and peace bonds," in which individuals accused of endangering others pledged to keep the peace. *Id.* at 1847, 1853. This concern for public safety demonstrates that "preventive detention and restraint clearly played a central role in pretrial proceedings in the Founding period." *Id.* at 1891; *see also* 4 William Blackstone, Commentaries *294 ("[I]n felonies, and other offences of a capital nature, no bail can be a security equivalent to the actual custody of the person."). So pretrial detention at the founding and § 922(n) have comparable justifications for burdening the Second Amendment right.

Ogilvie complains that bail "was intended solely to ensure the defendant's appearance at trial—not to protect the community." Op. Br. at 29. He cites two law review articles that reflect this premise. *See* Shima Baradaran, *Restoring the Presumption of Innocence*, 72 Ohio St. L.J. 723, 731, 733 (2011); Lauryn P. Gouldin, *Disentangling Flight Risk from Dangerousness*, 2016 BYU L. Rev. 837, 845 n.24 (2016). The *Bruen* framework leaves us with the difficult task of parsing the historical record to determine how courts in the founding era generally approached pretrial detention.

Scholarly debate has centered on this issue, with new research challenging the conventional belief that pretrial detention at the founding dealt with only the defendant's appearance at trial. *Contrast* Funk & Mayson, *supra*, at 1853, 1891 (stating that public safety was an important consideration for bail in the founding era), *with* Baradaran, *supra*, at 731 ("Bail historically served

22

the sole purpose of returning the defendant to court for trial, not preventing her from committing additional crimes."), *and* Gouldin, *supra*, at 845 n.24 ("[A]ll the available evidence points to the fact that pretrial detention, both under the English common law and at the time the Constitution was written, was limited to flight risk." (citation modified)). For example, a case study of Justice of the Peace Ebenezer Ferguson's criminal proceedings in Philadelphia revealed that "[t]he majority of bonds" required "'good behavior' as well as [defendants'] appearance" in court. Funk & Mayson, *supra*, at 1853 (citing Ebenezer Ferguson, Record Book of Ebenezer Ferguson, Justice of the Peace, Philadelphia, Pennsylvania, December 1799–July 1800, https://catalog.archives.gov/id/155501037). Other cases from the founding era similarly showed that courts considered public safety when deciding bail. *See, e.g.*, *Respublica v. Donagan*, 2 Yeates 437, 438 & n.a1 (Pa. 1799) (permitting a trial court to order surety for good behavior after the defendants' acquittal for murder under the court's "general authority to preserve the peace"); *Richmond v. Dayton*, 10 Johns. 393, 395 (N.Y. 1813) (per curiam) ("The statute authorizes and makes it the duty of the magistrate to bind to their good behavior all persons who threaten to break the peace, or who are not of good fame."); *Territory v. Nugent*, 1 Mart. (o.s.) 103, 104–05 (La. 1810) ("All the elementary writers agree that surety for the good behavior may be required of the persons charged with [libel].."); *see also* 5 Nathan Dane, A General Abridgment and Digest of American Law 277 (1824) (stating that sureties guaranteed that a

23

defendant would "personally appear at . . . court . . . and in the mean time keep the peace and be of good behaviour"). The historical record persuades us that public safety represented at least one of the justifications for pretrial detention and bail at the founding. The justification for § 922(n) is therefore comparable to the justification for its historical analogue.[17]

*    *    *

For these reasons, we conclude that § 922(n) is "relevantly similar" to pretrial detention and bail at the founding. Because § 922(n) falls within this historical tradition of firearm regulation, we hold that § 922(n) is facially constitutional.

<strong>CONCLUSION</strong>

We affirm.

---

[17] Ogilvie briefly argues that the justifications for § 922(n) and pretrial detention are not analogous because of their different burdens on the Second Amendment right. He contrasts pretrial detention's total disarmament with § 922(n)'s allowance for the retention of firearms. But a modern regulation poses no constitutional problem by imposing a *lesser* burden on the Second Amendment right than that of its historical analogue. *Rahimi*, 602 U.S. at 699 (stating that the historical analogue's burden of imprisonment (and therefore total disarmament) permits § 922(g)(8)'s lesser restriction of temporary disarmament). So Ogilvie's argument has no merit.

24-4089, *United States v. Ogilvie*

**TYMKOVICH**, Circuit Judge, concurring.

I concur with the judgment and the conclusion that history supports the presumptive disarmament of at least some indictees. I write separately to clarify how I understand this case fits into our Second Amendment jurisprudence.

Our role is to glean from historical practice "concrete principles that mark the borders of the [Second Amendment] right." *United States v. Rahimi*, 602 U.S. 680, 739 (2024) (Barrett, J., concurring). The historical evidence is clear that, at the founding, about half the states required pretrial detention for those charged with serious crimes. Pretrial detention results in the total deprivation of liberty—including disarmament. Given this evidence, we conclude, "at the founding, the Second Amendment existed in harmony with a categorical approach toward complete disarmament for those accused of serious crimes." Maj. at 15.

That principle is all we need to affirm Ogilvie's conviction. Because Ogilvie brings only a facial challenge, his arguments fail so long as § 922(n) is "constitutional in *some* of its applications." *Rahimi*, 602 U.S. at 693 (emphasis added).

We recognize that pretrial detention and § 922(n) are imperfect comparators. Questions remain as to what qualifies as a "serious crime" and what to do about states that allowed bail for most offenses. But if and how the analogy between pretrial detention and § 922(n) fails in some applications, we need not and do not decide today. In short, whether there remain viable as-applied challenges to § 922(n) is not before us but may be in the proper case. See *Ortega v. Grisham*, No. 24-2121, 2025 WL 2394646

(10th Cir. Aug. 19, 2025) (finding New Mexico's seven-day waiting period likely unconstitutional as applied to plaintiffs).

Similarly, Ogilvie argues that *Rahimi* requires an individual judicial determination before disarmament. That might be true in other cases or for other categories of people. But we do not rely on the same historic analogies or principles as *Rahimi*, so that argument "lacks relevance for our comparison of § 922(n) to pretrial detention." Maj. at 20. Our decision today does not turn on our interpretation of *Rahimi*.

The Supreme Court's decisions in *Bruen* and *Rahimi* return us to our proper judicial role—the case-by-case iterative process of "[p]ulling principle from precedent, whether case law or history." *Rahimi*, 602 U.S. at 740 (Barrett, J., concurring). Our role is not to "extrapolate [our] own broad new principles from those sources" to answer all Second Amendment questions. *Id.* at 712 (Gorsuch, J., concurring). The contours of the principles we identified in this case and the principles identified in *Rahimi* are best defined in the as-applied challenges that are sure to follow. We shall more prudently wait for when those challengers "[c]ome to this Court with arguments from text and history, and we are bound to reason through them as best we can." *Id.*

2