**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

───────────

**No. 24-4114**

───────────

UNITED STATES OF AMERICA,

Plaintiff − Appellee,

v.

BRANDON GLEN JACKSON,

Defendant – Appellant.

───────────

Appeal from the United States District Court for the District of Maryland, at Baltimore. Ellen Lipton Hollander, Senior District Judge.  (1:22–cr–00141–ELH–1)

───────────

Argued:  May 8, 2025                    Decided:  September 12, 2025

───────────

Before DIAZ, Chief Judge, and WYNN and THACKER, Circuit Judges.

───────────

Affirmed by published opinion.  Chief Judge Diaz wrote the opinion, in which Judge Wynn and Judge Thacker joined.

───────────

**ARGUED:**  Cullen Oakes Macbeth, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Greenbelt, Maryland, for Appellant.  Jason Daniel Medinger, OFFICE OF THE UNITED STATES ATTORNEY, Baltimore, Maryland, for Appellee.  **ON BRIEF:**  James Wyda, Federal Public Defender, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Baltimore, Maryland, for Appellant.  Erek L. Barron, United States Attorney, David C. Bornstein, Assistant United States Attorney, Chief, Appellate Division, OFFICE OF THE UNITED STATES ATTORNEY, Baltimore, Maryland, for Appellee.

───────────

DIAZ, Chief Judge:

Brandon Glen Jackson traveled with a gun across state lines while indicted for a state-law felony. That's a federal crime. The question before us is whether prosecuting Jackson for that act violated the Second Amendment.

Jackson's conduct is presumptively protected by the Constitution. But because the government has overcome that presumption, we affirm Jackson's conviction.

I.

Arizona bans short-barreled rifles. Ariz. Rev. Stat. §§ 13-3101(A)(8)(a)(iv), 13-3102(A)(3). In December 2020, a Phoenix police officer alleged that Brandon Glen Jackson "knowingly did manufacture, possess, transport, sell, or transfer" one. J.A. 58. That alleged conduct led state prosecutors to charge Jackson with a felony called "misconduct involving weapons." Ariz. Rev. Stat. § 13-3102(A)(3), (M). A state-court judge released Jackson on bail pending trial. Shortly after his release, Jackson lawfully acquired a Smith & Wesson 9mm handgun.

A state grand jury indicted Jackson on the same charge. Impeded by the COVID-19 pandemic, the case moved slowly.[1] In February 2022, while the misconduct-involving-

---

[1] After more than a year of pretrial proceedings, prosecutors dismissed Jackson's indictment and re-charged him, this time without the misconduct-involving-weapons offense. The new indictment alleged hindering prosecution (a felony) and passively resisting arrest (a misdemeanor).

Two years later, Jackson pleaded guilty to the misdemeanor charge, the state dropped the felony charge, and the court sentenced Jackson to six months' unsupervised probation. Sent'g Order at 2, *State v. Jackson*, No. CR2022-006716-001 (Ariz. Super. Ct. June 10, 2024). Jackson's probation ended without incident in November 2024.

2

weapons charge was still pending, Jackson drove from Arizona to the East Coast. He brought his handgun with him.

Jackson's drive brought him to Hagerstown, Maryland. There, state police arrested him after he admitted to carrying his gun without a permit. *See* Md. Code, Crim. Law § 4-203 (making it a misdemeanor to do so). When the police discovered Jackson's Arizona charges, they referred his case to Maryland federal prosecutors. In April 2022, a federal grand jury charged Jackson with violating 18 U.S.C. § 922(n), a statute that (in relevant part) makes it "unlawful for any person who is under indictment for a [felony] to ship or transport in interstate or foreign commerce any firearm or ammunition."

When Jackson was indicted, this circuit used a "'two-step' framework for analyzing Second Amendment challenges that combine[d] history with means-end scrutiny." *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 17 (2022); *see United States v. Staten*, 666 F.3d 154, 159 (4th Cir. 2011). But the Supreme Court rejected that test for another one two months after Jackson was charged. *Bruen*, 597 U.S. at 17.

Jackson seized on the new standard and moved to dismiss his federal indictment as unconstitutional. The district court denied the motion. *United States v. Jackson*, 661 F. Supp. 3d 392, 415 (D. Md. 2023).

Jackson then conditionally pleaded guilty. *See* Fed. R. Crim. P. 11(a)(2). Jackson's plea deal preserved his right to appeal the district court's denial of his motion to dismiss. The district court sentenced him to time served, and this appeal followed.

3

II.

Jackson presents a single issue on appeal: whether 18 U.S.C. § 922(n), as applied to him, violates his constitutional right to keep and bear arms.[2]  It doesn't.

A.

The Second Amendment protects "the right of the people to keep and bear Arms." U.S. Const. amend. II.  To decide whether the government has trodden on that right, we apply a "text-and-history standard." *Bruen*, 597 U.S. at 39.  If "the Second Amendment's plain text covers an individual's conduct," the state may regulate only within the "historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id.* at 17, 19.

Our circuit applies *Bruen* in two steps.  First, we ask "whether the Second Amendment's plain text covers the conduct at issue." *United States v. Price*, 111 F.4th 392, 398 (4th Cir. 2024) (en banc), *cert. denied*, 145 S. Ct. 1891 (2025).  To answer that question, we ask three others: (1) whether the person challenging the gun regulation is among "'the people whom the Second Amendment protects,'" (2) whether the person's weapons are "'in common use' for a lawful purpose," and (3) whether the person's "proposed course of conduct" is covered by the textual right to keep or to bear arms. *Id.* at 400–01 (quoting *Bruen*, 597 U.S. at 31–32).

At *Bruen* step two, the government bears the burden of proof. *See Md. Shall Issue, Inc. v. Moore*, 116 F.4th 211, 219 (4th Cir. 2024) (en banc), *cert. denied*, 145 S. Ct. 1049 (2025).  There, we ask "whether the Government has justified the regulation as consistent

---

[2] We review that question de novo. *United States v. Collins*, 982 F.3d 236, 243 (4th Cir. 2020).

4

with the 'principles that underpin' our nation's historical tradition of firearm regulation." *Price*, 111 F.4th at 398 (quoting *United States v. Rahimi*, 602 U.S. 680, 692 (2024)).

"Why and how the regulation burdens the right are central to [the step two] inquiry." *Rahimi*, 602 U.S. at 692. If founding-era laws "regulated firearm use to address particular problems," then modern laws "imposing similar restrictions for similar reasons" presumably pass constitutional muster, so long as they don't burden the right to bear arms "to an extent beyond what was done at the founding." *Id.*

## B.

The government thinks that Jackson never gets past *Bruen* step one. It invites us to hold that Jackson's offense—transporting a gun across state lines—falls "outside of what the plain text of the Second Amendment protects."[3] Appellee's Br. at 10. We decline.

## 1.

The Second Amendment's "plain text," *Bruen*, 597 U.S. at 32, protects "the right of the people to keep and bear Arms," U.S. Const. amend. II. To "keep Arms" means "to 'have weapons'"—that is, to "possess[]" them. *District of Columbia v. Heller*, 554 U.S. 570, 582–83 (2008). To "bear arms" means "to wear, bear, or carry upon the person or in the clothing or in a pocket, for the purpose of being armed and ready for offensive or defensive action in a case of conflict with another person." *Bruen*, 597 U.S. at 32 (cleaned up) (quoting *Heller*, 554 U.S. at 584). The right to "bear arms" thus includes a right to carry firearms in public for self-defense. *Id.* at 32–33.

---

[3] The government doesn't contest that Jackson is "part of the people" or that his handgun is "in common use for a lawful purpose." *Price*, 111 F.4th at 400 (cleaned up).

5

The government cites *Heller* and *Bruen*'s definitions of the "keep" and "bear" rights to argue that Jackson's conduct—shipping or transporting a firearm—"has nothing to do with 'keeping' or 'bearing.'"  Appellee's Br. at 12.

Perhaps some acts criminalized by § 922(n) fall outside the Second Amendment's plain text.  For example, placing a gun inside a crate and mailing it to another state might violate § 922(n)'s command not "to ship or transport in interstate or foreign commerce any firearm" and yet not burden a person's ability to keep or bear arms.[4]  And if some conduct proscribed by § 922(n) is unprotected at *Bruen* step one, then that would be enough to defeat a facial challenge to the statute.  *See Rahimi*, 602 U.S. at 693.

But Jackson doesn't argue that § 922(n) is invalid on its face.  He challenges the law as applied to him, so we must consider his "course of conduct."  *Bruen*, 597 U.S. at 32. Jackson placed a handgun in a car and then drove across state lines.  It's that conduct—not "shipping" or "transporting" a firearm in the abstract, Appellee's Br. at 12—that the Second Amendment's text must protect at *Bruen* step one.

By traveling with his gun, Jackson "kept" it in the constitutional sense: he "retain[ed]" it in his "custody."  *Heller*, 554 U.S. at 582.  So the Second Amendment's plain text covers his conduct.

---

[4] It may also be possible to infringe a person's Second Amendment rights without directly regulating keeping or bearing.  But this case doesn't require us to decide whether "the Second Amendment also protects ancillary rights necessary" to the rights to keep and bear arms.  *B & L Prods., Inc. v. Newsom*, 104 F.4th 108, 117–18 (9th Cir. 2024) (quotation omitted).

6

2.

The government has other step one arguments, but none persuade us. The government, for instance, says that felony indictees had few rights at the founding, since they were usually detained pending trial. According to the government, that means there was "no historical tradition" of giving indictees freedom to travel across state lines with firearms in tow. Appellee's Br. at 13. The government also says that interstate transportation of firearms was heavily regulated at the founding, so "the pre-existing right to keep and bear arms did not include an unfettered right to transport arms . . . across state lines." *Id.* at 15.

It's true that our Second Amendment decisions have held that "we can *only* properly apply step one of the *Bruen* framework by looking to the historical scope of the Second Amendment right." *Price*, 111 F.4th at 401 (emphasis in original); *see Bianchi v. Brown*, 111 F.4th 438, 447–48 (4th Cir. 2024) (en banc) (similar), *cert. denied*, 145 S. Ct. 1534 (2025). But *Bruen* itself forecloses the government's position.

The petitioners in *Bruen* wanted to "carry[] handguns publicly for self-defense," *Bruen*, 597 U.S. at 32, and they challenged "New York's licensing regime" because it "condition[ed] issuance" of a public-carry license "on a citizen's showing of some additional special need" for public carry, *id.* at 11. The Court found that the "definition of 'bear' naturally encompasses public carry" and concluded that the petitioners' desired conduct was protected by the "text of the Second Amendment." *Id.* at 32–33. The Court never asked, at the threshold, whether the right to "bear" included a right to bear without a special need. That question didn't relate to the Second Amendment's plain text.

7

We don't think that the "course of conduct" part of *Bruen* step one allows a free-floating inquiry into the historical scope of firearms rights that *Bruen* itself didn't invite. Whether felony indictees could bear arms at the founding doesn't determine the meaning of "bear," and whether founding-era citizens had a right to keep arms during interstate travel doesn't determine the meaning of "keep."

Historical limitations on firearms rights matter; they "define the scope of 'the right to keep and bear arms' as it was originally understood." *Rahimi*, 602 U.S. at 737 (Barrett, J., concurring). They just matter at *Bruen* step two. Importing an untethered historical limitations test into *Bruen* step one all but inverts the Court's instruction that the government "bears the burden to justify its regulation" of "arms-bearing conduct." *Id.* at 691 (majority opinion) (quotation omitted).

C.

On to step two—historical tradition. The government offers "three distinct historical threads" that it claims justify subjecting Jackson to § 922(n): laws governing bail and pretrial detention, surety laws, and laws disarming "dangerous or untrustworthy persons." Appellee's Br. at 20.

After exploring § 922(n)'s purposes, we sift through the government's evidence. On the record before us, we can't agree that bail and pretrial detention reflect a guiding principle that helps the government.

But surety laws, as construed in *Rahimi*, reveal that those accused of possessing dangerous weapons can be temporarily disarmed. And circuit precedent compels an even broader rule for "dangerous persons" laws: we've held that legislatures can rely on

8

categorical judgments (and "past conduct") to disarm those "who might be expected to misuse" guns. *United States v. Hunt*, 123 F.4th 697, 707 (4th Cir. 2024) (quotation omitted), *cert. denied*, 93 U.S.L.W. 3329 (2025).

1.

"Why and how" § 922(n) burdens the right to keep and bear arms "are central" to *Bruen* step two. *Rahimi*, 602 U.S. at 692. The statute's "how" is straightforward: temporary disarmament, on pain of criminal sanction. But § 922(n)'s "why," as reflected in the statute's history, demands more explanation.

Section 922(n)'s first federal ancestor was section 2(e) of the Federal Firearms Act. Ch. 850, 52 Stat. 1250, 1251 (1938). As codified, that law prohibited "any person who is under indictment or who has been convicted of a crime of violence or who is a fug[i]tive from justice to ship, transport, or cause to be shipped or transported in interstate or foreign commerce any firearm or ammunition." 15 U.S.C. § 902(e) (1940) (repealed 1968). The Senate Committee on Commerce thought the Federal Firearms Act's goal was to "eliminate the gun from the crooks' hands, while interfering as little as possible with . . . law-abiding citizen[s]," who had opposed "any attempt to take from [them] [their] means of protection from the outlaws." S. Rep. No. 75-82, at 2 (1937).

Twenty-three years later, Congress expanded § 902(e)'s reach from "crimes of violence" to felonies in general—that is, all crimes "punishable by imprisonment for a term exceeding one year." Act of Oct. 3, 1961, Pub. L. No. 87-342, § 2, 75 Stat. 757, 757. The amendment was "anticrime" legislation meant to "make it more difficult for the criminal

9

elements in our society to obtain firearms." H.R. Rep. No. 87-1202, at 2 (1961), *as reprinted in* 1961 U.S.C.C.A.N. 3067, 3068.

Seven years after that, Congress revised and recodified 15 U.S.C. § 902(e) as part of the Omnibus Crime Control & Safe Streets Act of 1968.[5] Pub. L. No. 90-351, § 902, 82 Stat. 197, 231.

The policy behind the Crime Control Act closely resembled that of its predecessors. Congress found "that the ease with which any person can acquire firearms other than a rifle or shotgun (including criminals, juveniles, . . . and others whose possession of such weapons is similarly contrary to the public interest) is a significant factor in the prevalence of lawlessness and violent crime." *Id.* § 901(a)(2), 82 Stat. at 225. Just as before, Congress determined that guns were dangerous in the hands of dangerous people. *See United States v. Quiroz*, 125 F.4th 713, 718 & n.24 (5th Cir. 2025) (glossing § 922(n) in the same way).

Subsection (n) took its current form in 1986:

It shall be unlawful for any person who is under indictment for a crime punishable by imprisonment for a term exceeding one year to ship or transport in interstate or foreign commerce any firearm or ammunition or

---

[5] As amended soon after, the statute read:

It shall be unlawful for any person—
(1) who is under indictment for, or has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year; [or]
(2) who is a fugitive from justice;
. . . .
to ship or transport any firearm or ammunition in interstate or foreign commerce.

18 U.S.C. § 922(g) (1970).

10

receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce.

Firearm Owners' Protection Act, Pub. L. No. 99-308, § 102(8), 100 Stat. 449, 452 (1986).

The Protection Act's focus was on liberalizing the gun control laws and protecting Second Amendment rights. *See id.* § 1(b)(1), 100 Stat. at 449. Section 922(n), as revised, served that goal: it disaggregated convicts from indictees and imposed a lighter burden on the latter. H.R. Rep. No. 99-495, at 23 n.15 (1986), *as reprinted in* 1986 U.S.C.C.A.N. 1327, 1360 ("[Indictees] are prohibited from receiving or transporting firearms but may continue to possess them.").

In sum, § 922(n) and its predecessors strike a balance between the public's interest in keeping arms away from those who might misuse them and the rights of individuals to be free from government intrusion. That's the "why" of the statute.[6]

2.

The parties spend much time discussing pretrial detention. The government says that if it could have detained Jackson pretrial, it can take the lesser step of disarming him during that time. Two of our sister circuits have accepted this argument in decisions

---

[6] The government says that § 922(n) is also meant to "maintain[] the integrity of the judicial process" by preventing felony indictees from getting "a new gun which might be used to threaten or kill" those involved in the case. Appellee's Br. at 20.

There's no historical support for that theory. The government relies instead on the Sixth Circuit's decision in *United States v. Gore*, which cited no authority for what it called § 922(n)'s "obvious justifications." 118 F.4th 808, 814 (6th Cir. 2024).

With all respect to our sister circuit, we aren't willing to guess at the policy goals § 922(n) serves. Section 922(n)'s extensive statutory and legislative history nowhere mentions safeguarding the judicial process. We see no need to supplement that record with our speculation.

11

sustaining § 922(n) on its face.  *See Quiroz*, 125 F.4th at 718–25; *United States v. Gore*, 118 F.4th 808, 814–17 (6th Cir. 2024).

The argument makes intuitive sense.  A pretrial detainee loses most liberties, including the ability to keep and bear arms.  If states can impose that greater burden, then § 922(n)'s "lesser restriction of temporary disarmament" must be permitted, too.  *Rahimi*, 602 U.S. at 699; *see Quiroz*, 125 F.4th at 718; *Gore*, 118 F.4th at 815.  So if defendants at the founding were detained pretrial for policy reasons that resemble § 922(n)'s, then there's a match on both "why" and "how," and § 922(n) survives *Bruen*.

The government claims it's made that showing.  At the founding, says the government, defendants indicted on capital offenses were imprisoned pending trial without bail.  Because the Founders were far looser with capital punishment than we are now, "many modern-day felonies were capital offenses at the founding."  *Quiroz*, 125 F.4th at 723; *see Gore*, 118 F.4th at 814–15.  That makes for a match on the "how."  And because (the government asserts) founding-era pretrial detention was partly meant to prevent indictees from causing harm, there's a match to § 922(n)'s "why."  *Quiroz*, 125 F.4th at 724–25; *Gore*, 118 F.4th at 814.

But even if historical pretrial detention matches § 922(n)'s "how," on this record, we doubt it matches the "why."  That's because the government has provided no evidence for its claim that founding-era pretrial detention served preventive ends.

In another case and on a different record, we may be persuaded otherwise.  But today (as we explain), we choose not to rest on the history of pretrial detention.

12

a.

In the 1780s, roughly half of the colonies followed a "common-law model" of bail based on English law, and roughly half followed a more defendant-friendly "dissenter model" pioneered in Massachusetts and Pennsylvania. Kellen R. Funk & Sandra G. Mayson, *Bail at the Founding*, 137 Harv. L. Rev. 1816, 1826 (2024).

On the common-law model, bail was forbidden for serious crimes, required for petty ones, and discretionary for "the vast majority of cases" between. *Id.* at 1832–33. For cases where discretion was allowed, bail was largely based on "probability of guilt," but the defendant's reputation mattered, too. *Id.* at 1833–34 & n.97.

On the dissenter model, pretrial detention was never mandatory. Most prisoners had a right to bail, but magistrates had discretion to deny bail for capital crimes. *Id.* at 1842. Even in capital cases, bail could be denied only "where the proof [was] evident or the presumption great." *Id.*; *see* Matthew J. Hegreness, *America's Fundamental and Vanishing Right to Bail*, 55 Ariz. L. Rev. 909, 921 n.40 (2013) (finding similar language in forty-two state constitutions).

The dissenter model would become the national standard. The Confederation Congress made it the rule for the Northwest Territory. Northwest Ordinance art. II, 1 Stat. 51, 52 n.(a) (1787). The First Congress passed a version of it for the federal system. Judiciary Act of 1789, ch. 20, § 33, 1 Stat. 73, 91. And almost every new state admitted to the Union adopted it.

But at the founding, it might "not yet have been clear" that the dissenter model would become the rule. Funk & Mayson, *supra*, at 1842. By the end of 1792, nine states

13

followed the common-law model, and six states followed the dissenter model. *See id.* at 1842–43 & nn.156–57; Hegreness, *supra*, at 922–23 & n.40. So we take both systems to be relevant to our analysis.

In common-law states, those charged with serious crimes were denied bail. Under the "inherited English model" that those jurisdictions adopted, Funk & Mayson, *supra*, at 1832, defendants charged with treason, murder, burglary, arson, forgery, and horse-stealing (not to mention "persons excommunicated") were "clearly not admissible to bail by a justice of the peace." 1 Joseph Chitty, *A Practical Treatise on the Criminal Law* 95–96 (London 1816); *see* Anthony Highmore, *A Digest of the Doctrine of Bail* 164–70 (London, T. Cadell 1783); Charles Petersdorff, *A Practical Treatise on the Law of Bail* *489–96 (Philadelphia, John S. Littell 1835).

In dissenter states, there was no such thing as a non-bailable crime. Even in capital cases, pretrial detention wasn't mandatory unless "the proof [was] positive or the presumption great." *E.g.*, Del. Const. of 1792, art. I, § 12. So when the evidence against a defendant was weak, that defendant could be granted bail. *See, e.g.*, *United States v. Hamilton*, 3 U.S. (3 Dall.) 17, 17–18 (1795) (reversing a district court that refused bail to an accused traitor).

But in dissenter jurisdictions, the rule changed after indictment. The famous trial of Aaron Burr provides a good example. On June 24, 1807, partway through the proceedings, a Richmond grand jury indicted Burr on treason charges. 1 David Robertson, *Reports of the Trials of Colonel Aaron Burr* 305–06 (Philadelphia, Hopkins & Earle 1808). The government moved to have Burr committed pretrial. *Id.* at 306. Chief Justice

14

Marshall, riding circuit, opined that the Judiciary Act "enabled the court to bail a prisoner arrested for treason," but that "the finding of the grand jury would be the evidence on which the court would have to judge" whether to do so. *Id.* at 310–11.

Marshall "doubted extremely, whether the court had the right to bail any person, after an indictment for treason had been found against him by a grand jury." *Id.* at 311. He could think of no case where a court could examine evidence outside the indictment to decide whether to permit bail, and he demanded "adjudged cases, to prove that the court could bail a party, against whom an indictment had been found." *Id.* at 312. Burr had none, so he was "conducted to the gaol of [the] city, and the court adjourned." *Id.*

Marshall's suspicions quickly became settled law. In dissenter states, capital defendants had a right to bail unless the proof was evident or the presumption great. But many states held that "an indictment for a capital offense does of itself furnish a presumption of the guilt too great to entitle [the defendant] to bail." *People v. Tinder*, 19 Cal. 539, 543 (1862) (Field, C.J.). After indictment, "a Defendant [was] presumed to be guilty" (except for purposes of "trial before a *petit* jury"), and that "presumption [was] so strong, that in the case of a capital felony, the party [could not] be let to bail."[7] *State v. Mills*, 13 N.C. (2 Dev.) 420, 421–22 (1830); *see Hight v. United States*, Morris 407, 412 (Iowa 1845); *Territory v. Benoit*, 1 Mart. (o.s.) 142, 142–43 (Orleans 1810) (per curiam);

---

[7] Some states put much less stock in an indictment. In Virginia and South Carolina (both common-law states pre-Civil War, *see* Hegreness, *supra*, at 930, 989), judges could consider evidence not before the grand jury when deciding whether to grant bail to a person accused of a capital crime. *Commonwealth v. Rutherford*, 26 Va. (5 Rand.) 646, 648–49 (1826); *State v. Hill*, 6 S.C.L. (1 Tread.) 242, 244 (1812) (opinion of Brevard, J.). But theirs seems to have been the minority rule.

*cf. Ex Parte Tayloe*, 5 Cow. 39, 56 (N.Y. Sup. Ct. 1825) (opinion of Sutherland, J.) ("The indictment must be taken as conclusive upon the degree of the crime.").[8]

b.

In sum, after indictment for a capital crime, bail was forbidden, whether at common law or in the so-called "dissenter" states. Assuming that felony offenses today can fairly be analogized to capital crimes at the founding,[9] that makes pretrial detention relevantly similar to § 922(n)'s "how."

That said, it's difficult to analogize the "why" of pretrial detention to the "why" of § 922(n). Section 922(n)'s goal, in essence, is preventive (i.e., forward-looking) justice. Congress sought to disarm felony indictees because it believed that they were especially likely to commit firearms offenses.

At the founding, mandatory post-indictment detention in capital cases seems to have served different, backward-facing goals. Bail was supposed to be denied in discretionary cases (including in dissenter-jurisdiction capital cases) based on likelihood of guilt, not odds of harm to the public. Funk & Mayson, *supra*, at 1833, 1842.

---

[8] New York wasn't a dissenter state. Hegreness, *supra*, at 930; *see People v. Van Horne*, 8 Barb. 158, 163 (N.Y. Oyer & Terminer 1850). Still, the views of New York courts were persuasive in dissenter jurisdictions. *See, e.g.*, *Tinder*, 19 Cal. at 544–46 (quoting and citing New York cases).

[9] That premise, to be clear, may not hold true. Maybe capital crimes at the founding are too unlike the set of all modern-day felonies in 2025 to be properly analogous. Perhaps even archetypal felonies like "theft, burglary, and robbery were, on the whole, not capital" at the turn of the nineteenth century. *Kanter v. Barr*, 919 F.3d 437, 459 (7th Cir. 2019) (Barrett, J., dissenting) (cleaned up); *see Range v. Att'y Gen.*, 124 F.4th 218, 227 (3d Cir. 2024) (en banc). Our circuit hasn't weighed in on either the history or the analogy, and we take no position today.

16

Lord Coke, describing the common-law rule, explained that "[a] man arrested or imprisoned (and bailable) for felony shal be bailed before it appeareth whether he be guilty or no." 4 Edward Coke, *The Institutes of the Laws of England* 178 (London, W. Lee & D. Pakeman 1644). The same rule justified denying post-conviction bail: "if a man be convicted by verdict or confession, &c. he is not bailable, because it appeareth that he is guilty." *Id.* One Antebellum judge could find no "adjudged case, or any text book of respectability, which question[ed]" that rule. *People v. Dixon*, 3 Abb. Pr. 395, 397 (N.Y. Sup. Ct. 1856).

A court deciding whether to grant bail to a capital defendant had to look at the strength of the evidence for the charged offense. But grand jury evidence was kept secret. Because judges had no way to review the grand jury's decision, they had to defer to it.[10] *See Benoit*, 1 Mart. (o.s.) at 142; *Tinder*, 19 Cal. at 544; *United States v. Reed*, 27 F. Cas. 727, 738 (C.C.N.D.N.Y. 1852) (No. 16,134) (Nelson, Circuit Justice); *see also* 1 Chitty, *supra*, at 129–30. In places where the evidence before the grand jury was available for review, some courts held that "[t]he question of bail" was "open to consideration to the

---

[10] The English Court of King's Bench, which had discretion to grant bail even in capital cases, *see* Highmore, *supra*, at 179–80, observed a similar rule for similar reasons:

> If a man be found guilty of murder by the coroner's inquest, we sometimes bail him, because the coroner proceeds upon depositions taken in writing which we may look into. Otherwise, if a man be found guilty of murder by a grand jury; because the Court cannot take notice of their evidence, which they by their oath are bound to conceal.

*Lord Mohun's Case* (1697) 91 Eng. Rep. 96; 1 Salk. 104.

17

same extent that it would be if applied for before indictment." *People v. Baker*, 10 How. Pr. 567, 570 (N.Y. Oyer & Terminer 1855) (murder prosecution).

The government offers no evidence that the founding generation denied bail to prevent future offenses; nor does it argue that the Founders' backwards-facing concerns resemble § 922(n)'s forward-looking goals. Instead, the government asserts that both § 922(n) and founding-era laws were meant to "ensure the defendant's appearance at trial and to keep the public safe in the meantime." Appellee's Br. at 23 (quoting *Gore*, 118 F.4th at 814). But we don't see how § 922(n) serves the former purpose, and the historical evidence we've surveyed suggests that founding-era pretrial detention wasn't seen as serving the latter.

The government's only authority is *Gore*, but that case's sources don't withstand scrutiny. *Gore* asserts that public safety was a goal of the bail system. 118 F.4th at 814 (citing Funk & Mayson, *supra*, at 1853). But bail law served that public safety function because bail bonds would typically "guarantee a defendant's 'good behavior' as well as their appearance." Funk & Mayson, *supra*, at 1853. In other words, public safety was served by *granting* bail, not denying it. *See* 4 Coke, *supra*, at 180 (discussing bail in the form of "surety of the peace, and surety of the good behavior").

One of *Gore*'s other sources does say in passing that bail wasn't universal in criminal cases so "that the safety of the people should be preserved against the lawless depredations of atrocious offenders." Highmore, *supra*, at vii. But that view, to our knowledge, wasn't endorsed by founding-era courts, and modern scholars "disagree as to when pretrial law

18

first endorsed restraint for dangerousness." Sandra G. Mayson, *Dangerous Defendants*, 127 Yale L.J. 490, 502 (2018).

The best we can say for now is that the history of pretrial detention "does not establish that community protection was unimportant." Albert W. Alschuler, *Preventive Pretrial Detention and the Failure of Interest-Balancing Approaches to Due Process*, 85 Mich. L. Rev. 510, 549 (1986). Under *Bruen*, that ambivalence weighs against the government.

c.

To a modern-day court, the preventive purpose of pretrial detention seems obvious. But today's common sense is yesterday's nonsense. Within living memory, the idea of denying bail "to protect society from predicted but unconsummated offenses" seemed "unprecedented in this country," even to avoid "[g]rave public danger" from what a defendant "may be expected to do." *Williamson v. United States*, 184 F.2d 280, 282 (2d Cir. 1950) (Jackson, Circuit Justice). "Clearly," to some judges, "it [was] not the function of bail to prevent the commission of crimes between indictment and trial." *United States v. Foster*, 79 F. Supp. 422, 423 (S.D.N.Y. 1948). The government has given us no reliable evidence that the founding generation thought differently.

We don't need to finally resolve whether founding-era pretrial detention is "relevantly similar" to some § 922(n) prosecutions. *Bruen*, 597 U.S. at 29. We conclude only that the government hasn't proven, on this record, that it is.

19

3.

The government next contends that founding-era surety laws justify Jackson's prosecution. This second tradition makes a better match, and we find it sufficiently analogous to this case.

At the founding, surety laws made up an "individualized . . . regime" that "authorized magistrates to require individuals suspected of future misbehavior to post a bond." *Rahimi*, 602 U.S. at 695; *see Bruen*, 597 U.S. at 56–57. Absent a bond, the person "would be jailed." *Rahimi*, 602 U.S. at 695. And if the person "did post a bond and then broke the peace, the bond would be forfeit." *Id.*

Surety laws "typically targeted only those threatening to do harm." *Bruen*, 597 U.S. at 55. But they "could be invoked to prevent all forms of violence, including spousal abuse" and "the misuse of firearms." *Rahimi*, 602 U.S. at 695–96. One statute even authorized "the imposition of bonds from individuals '[who went] armed with . . . offensive and dangerous weapon[s].'" *Id.* at 696 (quoting Mass. Rev. Stat. ch. 134, § 16 (1836)).

a.

Section 922(n), as applied to Jackson, limited his right to keep arms after a grand jury found probable cause that he "knowingly did manufacture, possess, transport, sell, or transfer a 10[.]5-inch barrel rifle, a prohibited weapon." J.A. 63. That burden on Jackson's rights bears relevant similarities to historical surety laws.

**Conduct triggering the restriction.** Jackson's rights were limited because he exercised control in some way over a dangerous weapon. That's analogous to the surety statutes, which penalized "go[ing] armed with a . . . pistol[] or other offensive and

20

dangerous weapon," whatever the person's reason. Mass. Rev. Stat. ch. 134, § 16 (1836); *see also, e.g.*, Act of Mar. 14, 1848, ch. 120, 1847–1848 Va. Acts 93, 129 (enacting Va. Crim. Code ch. 14, § 16 (1848)); *Bruen*, 597 U.S. at 56 ("Between 1838 and 1871, nine other jurisdictions adopted variants of [Mass. Rev. Stat. ch. 134, § 16].").

True, many surety statutes had self-defense exceptions, and § 922(n) doesn't. But some surety statutes, like Massachusetts's, reached *all* pistols, and Jackson was indicted in Arizona for possessing an unusually dangerous gun. It's hard to say that § 922(n), as applied, imposes a greater burden on the right to bear in this respect. *See Rahimi*, 602 U.S. at 698–99.

**Process before restriction.** Jackson's rights were limited only after a grand jury found probable cause that he'd already committed a felony. Surety laws generally required no more than "reasonable cause to fear that the accused would do [a person] harm or breach the peace." *See id.* at 696 (quotation omitted). And a magistrate decided whether there was reasonable cause. *Id.* at 695. These procedural protections closely resemble § 922(n).

Jackson protests that surety laws required adversarial proceedings, and that a grand jury is hardly a serious obstacle for the government. But Massachusetts's surety law, at least, required an adversarial proceeding only *after* a magistrate judge had found reasonable cause. Mass. Rev. Stat. ch. 134, § 3. When the accused came before the magistrate, he could be "heard in his defense," but the magistrate could make the accused "enter into a

recognizance" then and there—with no indication from the statute that a higher burden of proof was needed for the deprivation.[11]  *Id.* § 4.

Nor does substituting a grand jury in for a neutral magistrate destroy the analogy to § 922(n).  Yesterday's magistrate, like today's grand jury, could burden gun rights ex parte and on probable (or reasonable) cause.  And those that voted for the Bill of Rights expected the grand jury's "functional independence" to be a "buffer" against government abuses. *United States v. Williams*, 504 U.S. 36, 47–48 (1992); *see Costello v. United States*, 350 U.S. 359, 362 (1956); *Charge to Grand Jury*, 30 F. Cas. 992, 993 (C.C.D. Cal. 1872) (No. 18,255) (Field, Circuit Justice).  We doubt the Founders wrote grand juries into the Bill of Rights to curtail civil liberties.

**Time-boundedness.**  Sureties were "limited [in their] duration," and so is § 922(n). *Rahimi*, 602 U.S. at 699.  The statute in *Rahimi* releases its grip on regulated persons as soon as the restraining order they are subject to expires.  *Id.*  Likewise, Jackson was only disarmed for as long as he was under felony indictment.

The historical sureties discussed in *Rahimi* didn't last longer than six months.  *Id.* at 697.  Jackson was under indictment for fifteen months on his first felony indictment and fifteen more months on his second.  But that's not much longer, in the aggregate, than

---

[11] *Bruen* and *Rahimi* treat Massachusetts's surety law as representative, so we feel justified in doing the same.  *Bruen*, 597 U.S. at 55–57; *Rahimi*, 602 U.S. at 696–97.  But other states' laws reinforce our conclusion.  In Maine, for instance, justices of the peace could require sureties from persons "going armed" with dangerous weapons "on the complaint of any person having cause"—no adversarial process required.  *Contrast* 12 Me. Rev. Stat. ch. 169, § 16 (1840), *with id.* § 5 (for other accusations, sureties permitted only after "defence has been heard").  The same was true in Wisconsin.  *See* An Act to Prevent the Commission of Crimes § 16, 1838 Wis. Terr. Stat. 379, 381.

Zackey Rahimi's two-year restraining order.  *Id.* at 687.  In fact, it's probably shorter, considering that Rahimi's restraining order will remain in force for one or two years after he finishes his federal sentence.  *Id.*  If Rahimi's disability was time-limited enough, then so is Jackson's.

**Severity of the burden.**  Section 922(n) burdens Jackson's Second Amendment rights less than either the statute in *Rahimi* or the historical laws *Rahimi* relied on.  Surety laws could imprison a person without the resources to pay a bond merely on suspicion of future misbehavior.  *Id.* at 695.  Their cousins, the "going armed" laws, imprisoned those who breached the peace while armed with dangerous weapons.  *Id.* at 697.  One can't carry arms in prison, so the greater penalty of imprisonment permits the lesser penalty of disarmament.  *Id.* at 699.

And Jackson, unlike Rahimi, was never completely deprived of his Second Amendment rights.  While under felony indictment, Jackson could possess and carry guns and ammunition, so long as he got those guns and ammunition pre-indictment and didn't carry them across state lines.  *See* 18 U.S.C. § 922(n).  That's far from a categorical prohibition, even if it limits one's ability to keep and bear arms.

b.

Having identified an analogous "how," we easily dispense with the "why."  Surety laws existed to prevent persons who "would do . . . harm or breach the peace" from having an opportunity to do so.  *Rahimi*, 602 U.S. at 696.  The point was to stop harm before it happened.

23

Section 922(n)'s rationale is identical: to "eliminate the gun from the crooks' hands," S. Rep. No. 75-82, at 2, and to prevent harm by keeping weapons from those who would abuse them, *see* Omnibus Crime Control Act § 901(a)(2), 82 Stat. at 225. Since § 922(n) and surety laws share a key purpose—prevention—we can conclude with confidence that the latter justifies subjecting Jackson to the former.

The "principles that underpin" surety laws, *Rahimi*, 602 U.S. at 681, lead to a rule: just as legislatures have the power to disarm those "who threaten physical harm to others," *id.* at 690, so too can they disarm those who possess dangerous weapons while under felony indictment. Section 922(n), as applied to Jackson, comports with that tradition and thus *Bruen*.

### 4.

The government offers a third historical tradition to buttress its position. It contends that our precedent on "dangerous persons" demands that we affirm the district court. Here, too, we agree. Even if our discussion of founding-era surety laws were mistaken, we would still sustain Jackson's conviction.

### a.

Our recent decision in *United States v. Hunt* disposes of both the "how" and the "why" of § 922(n). *Hunt* held that 18 U.S.C. § 922(g)(1), the felon-in-possession statute, is constitutional as applied no matter what felony the defendant was convicted of. 123 F.4th 697, 700 (4th Cir. 2024). *Hunt* concluded that our historical tradition of gun regulation allows "status-based restrictions to disqualify categories of persons from

24

possessing firearms." *Id.* at 705 (quoting *United States v. Jackson*, 110 F.4th 1120, 1129 (8th Cir. 2024) (no relation), *cert. denied*, 221 L. Ed. 2d 970 (U.S. 2025)).

Two families of gun restrictions produced two regulatory principles, and both supported *Hunt*'s conclusion. Under the first principle, early legislatures could (and did) disarm those who "demonstrated disrespect for legal norms." *Hunt*, 123 F.4th at 706 (quoting *Jackson*, 110 F.4th at 1127). Indeed, they often did so categorically, based on membership in a distrusted group. *Id.* at 706–07. Under the second, legislatures could prohibit gun ownership by groups of persons that the legislature deemed "potentially violent or dangerous." *Id.* at 707. Thus, "[e]ven though 'not all Protestants or Catholics in England, not all Native Americans, not all Catholics in Maryland, not all early Americans who declined to swear an oath of loyalty . . . were violent or dangerous persons,' all could be disarmed." *Id.* (quoting *Jackson*, 110 F.4th at 1128).

*Hunt*'s second principle—risk of dangerousness—supports the government's position here. When Congress passed § 922(n), it feared letting guns fall into criminal hands. *Hunt* holds that Congress can legislate using proxies for dangerousness. *Id.* at 707–08. And although "felony indictment" is a less effective proxy for dangerousness than "felony conviction," § 922(n)'s temporary and partial disarmament burdens Second Amendment rights far less severely than does § 922(g)(1)'s lifetime ban.[12]

---

[12] Our recent decision in *United States v. Gould* confirms this understanding. There, we reaffirmed *Hunt*'s conclusion that, at the founding, "legislatures had the authority . . . to disarm categories of people based on a belief that the class posed a threat of dangerousness." 146 F.4th 421, 431 (4th Cir. 2025).

b.

Jackson flees *Hunt*, but he can't escape it. Before addressing the *Bruen* test, *Hunt* concluded that our pre-*Bruen* precedents rejecting as-applied challenges to § 922(g)(1) were still binding. *Id.* at 703–04. Jackson contends that once *Hunt* reached that conclusion, "every part of [its] reasoning" was unnecessary to its holding and thus dictum. Reply Br. at 11.

Wrong. *Hunt* indicates throughout that its *Bruen* step two holding was issued in the alternative to its other conclusions. *See, e.g.*, 123 F.4th at 702 ("even if we were unconstrained" by panel precedent); *id.* at 704 ("even if"); *id.* at 705 ("even if"). And alternative holdings aren't dicta. *United States v. Mitchell*, 120 F.4th 1233, 1240 (4th Cir. 2024).

To be sure, *Hunt*'s language isn't dispositive. Judges "cannot transmute dictum into decision by waving a wand and uttering the word 'hold.'" *United States v. Rubin*, 609 F.2d 51, 69 n.2 (2d Cir. 1979) (Friendly, J., concurring). But *Hunt*'s holdings are truly alternative; each is "broad enough to sustain [the decision] independently" of the others. *United States v. Title Ins. & Tr. Co.*, 265 U.S. 472, 486 (1924).

Jackson disagrees. When a panel's first holding undermines its ability to make others, he says, "the panel's 'further conclusions constitut[e] dicta.'"[13] Reply Br. at 13

---

[13] In support, Jackson relies on *United States v. Horsley*, where we defined "dictum" as any statement "that could have been deleted without seriously impairing the analytical foundations of the holding." 105 F.4th 193, 212 (4th Cir. 2024) (cleaned up). But *Horsley*'s definition can't be read as broadly as Jackson would like. *Horsley* didn't confront alternative holdings, and its rule, if applied blindly, would destroy them.

(quoting *Freed v. Thomas*, 976 F.3d 729, 739 (6th Cir. 2020)).  Using that language, Jackson contends that *Hunt* couldn't have gone past panel precedent.  In his view, once *Hunt* determined that it was bound by pre-*Bruen* caselaw, that meant *Bruen* didn't apply—and the panel thus "could not apply" it.  *Id.*

Wrong again.  *Freed* discussed a prior Sixth Circuit case that concluded "the district court lacked subject-matter jurisdiction."  976 F.3d at 738 (discussing *Wayside Church v. Van Buren County*, 847 F.3d 812 (6th Cir. 2017)).  *Wayside Church* then went on to discuss other grounds for reversal.  *Freed*, 976 F.3d at 739.  But if the district court didn't have jurisdiction, *Freed* reasoned, the panel in *Wayside Church* didn't either, so that panel had no power to do anything but dismiss.  *Id.*; *see Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998).  Under those circumstances, *Freed* refused to give binding effect to *Wayside Church*'s later discussion.  976 F.3d at 740.

In our view, *Freed* was limited to jurisdictional rules—that is, those rules that affect a court's "power to hear a case."  *United States v. Cotton*, 535 U.S. 625, 630 (2002).  But just as the law-of-the-case doctrine and the mandate rule go to merits, not jurisdiction, *Crow Tribe of Indians v. Repsis*, 74 F.4th 1208, 1221 (10th Cir. 2023), the panel precedent rule doesn't undermine our power to decide.

So *Freed* can't rescue Jackson from *Hunt*.

---

When a case renders two alternative holdings, each independently supports the result.  Since each could be deleted without impairing the judgment, neither is necessary, so (on Jackson's view) both are dicta.  But if both holdings are dicta, that implies the case decided nothing at all.  We don't read *Horsley* to endorse that result.  *See United States v. Johnson*, 256 F.3d 895, 914–15 & n.8 (9th Cir. 2001) (en banc) (separate opinion of Kozinski, J.) (reasoning similarly).

III.

Jackson's conduct is entitled to Second Amendment protection, but two different regulatory traditions permit the government to punish him all the same. Our nation's history and tradition of gun regulation shows that those accused of possessing unlawful weapons can be temporarily disarmed today. And our nation's tradition of categorically disarming potentially dangerous groups separately justifies Jackson's prosecution. On the facts here, 18 U.S.C. § 922(n) presents no constitutional problem.

The district court's judgment is therefore

*AFFIRMED.*